## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAYRLAND

JUSTIN MILLS,          :

     **Plaintiff**        :

                   :     **CASE NO: 1:15:-cv-00495-RDB**

vs.                  :

                   :

ANNE ARUNDEL COUNTY   :

MARYLAND, et al        :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO STRIKE DEFENDANTS' EXPERTS

### I. FACTS AND BACKGROUND

This is an action involving the alleged seizure, battery, false imprisonment and other torts brought by Plaintiff against Defendants. The respective defendants are police officers with Anne Arundel County (Bilter and Shapelow), hereafter referred to as the "Police Defendants," and a casino and its highest security officer at the casino at the time of the seizure of Plaintiff (PPE and Coulter), hereafter referred to as the "Casino Defendants." The events were captured on surveillance video operated by Defendant, PPE, and can be viewed as the "lodged video" as filed attendant to the pending motions for summary judgment. See ECF 114. Some of the events were also captured on an audio recording by Plaintiff, the pertinent parts of which can be reviewed on an audio recording overlaid on part of the lodged video, made by Plaintiff during an alleged detention in a hallway at PPE's casino, posted to YouTube, provided to chambers in the pending motions for summary judgment and also available at <https://www.youtube.com/watch?v=LlMexfd2e8s&t=81s> (viewed 5/11/17), and referred to therein, and here, as the "public video/audio." Plaintiff and Defendants have authenticated the events on these respective recordings. Plaintiff's Declaration, ECF 113-2, ¶ 20; Bilter Deposition, exhibit 3, pp. 46-47;

Coulter Deposition, exhibit 4, p. 119 :9-17. As authenticated recordings, the words and events appearing on the recording are conclusive.[1]

Further, circumstances concerning the audio recording have been disclosed and averred by the Plaintiff. Supplemental Answers to Interrogatories, exhibit 1, ⁋ 10. As indicated, the original audio recording was on Plaintiff's cell phone. See Exhibit 10. As Plaintiff began to review the audio on his lengthy cab ride home, he deleted moments of silence on this recording, saving only those portions where audio was actually captured by the recording. The original cell phone is no longer available, but prior to its loss, Plaintiff downloaded the complete audio, with silence redacted, onto his computer. The audio which was provided in the disclosures in this matter is the audio that was downloaded onto Plaintiff's computer and includes all audio, save for silence, captured by the Plaintiff on his cell phone.

## II. REPORTS PROVIDED RELATIVE TO DISCLOSED EXPERTS

### A. PPE AND COULTER'S EXPERT, MICHAEL HODGE

The Casino Defendants have disclosed Michael Hodge as a purported security expert to provide testimony in this matter. Mr. Hodge's report has been provided. Exhibit 2. The report discloses the parameters of his retention as follows:

1) Did Maryland Casino Live Security operate within the standards of care with respect to Mr. Mills?

---

[1] People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd., 111 Nev. 615, 621 (1995), In re Bailey, No. 2006-386, 2008 WL 2793848, at *2 (Vt. Apr. 2008)(An authenticated video showing unambiguous events would constitute "conclusive direct evidence" of the events portrayed); Lee v. City of Norwalk, Ohio, No. 3:11 CV 897, 2012 WL 3778975, at *2 (N.D. Ohio Aug. 30, 2012) aff'd, 529 F. App'x 778 (6th Cir. 2013) (authenticated video properly controls over conflicting statements.); Stevens v. Mkt. Basket Stores, Inc., 176 So. 3d 1065, 1070 (La. App. 2015); accord Scott v. Harris, 550 U.S. 372, 380 (2007); Griffin v. Hardrick, 604 F.3d 949, 955 (6th Cir. 2010); State v. Smith, No. 05-11-00742-CR, 2012 WL 1059703, at *4 (Tex. App. Mar. 30, 2012)(video evidence established the facts over contrary testimony); Hall v. State, 829 S.W.2d 407, 408 (Tex. App. 1992).

2) Did Maryland Casino Live (sic) conspire to (sic) Anne Arundel Police to violate Mr. Mills Civil Rights?

Exhibit 2, p. 1.

With apparent reference to the questions posed, Hodge offers the following sub-opinions preliminary to stating his ultimate opinions:

1) "As an invitee within the standards of care in the security industry, Mr. Mills was owed a duty of reasonable (sic) from foreseeable risks of harms and as an invitee; that (sic) duty is subject to revocation by those who control the premises." Exhibit 2, p. 2 under "Duty of Care."

2. "There are no facts in this case to support that Security in this matter inflicted offensive contact upon Mr. Mills at any time." Exhibit 2, p. 3.

3. "The facts are clear that the Security Staff of Maryland Casino Live (sic)[2] in no way train, agree upon, or work together in their respective employment role (sic)." Exhibit 2, p. 5.

4. "Maryland Casino Live (sic) Standard Operating Procedures is (sic) clear as it (sic) identifies is (sic) requirement to have police officers respond and address violations of Maryland Law." Exhibit 2, p. 5.

5. "[S]ecurity approached Mr. Mills and attempted to expeditiously escort him to an area outside the public's view for further action of obtaining information for the eviction form." Exhibit 2, p. 4.

Depositions and discovery have been completed. Hodge has not altered or supplemented his opinions in any respect.

Finally, on the sub-opinions, Hodge provides his concluding opinions stating that "Defendants Maryland Casino Live (sic) and its employees:

1) Did not breach any standards of care owed to the Plaintiff.

2) At all times used reasonable (sic) to evict Mr. Mills from its premises.

3) At all times respected the civil rights of Mr. Mills.

4) Did not conspire with Anne Arundel Police to violate any civil rights of Mr. Mills."

---

[2] It would either be PPE or Maryland Live!, and Hodge's reference is to no known entity.

As shown in the following analysis, the opinions and sub-opinions of Hodge are entirely divorced from the established facts and the facts as relayed by Defendants. The conclusions rely upon false premises and outright falsehoods regarding the underlying facts. The conclusions are also rife with misstatements of law in addition to the misstatements of fact peppering the opinion. In short, the report and its underlying opinions are self-serving conclusions divorced from reason or meaningful analysis, and due to the internal unreliability and errors within his report, nothing concerning Hodge could legitimately assist the trier of fact in evaluating the claims and defenses of the respective parties.

### B. BILTER AND SHAPELOW'S EXPERT, FREDERICK HAGGERTY

The Police Defendants have disclosed Frederick Haggerty ("Haggerty") as a purported media expert to provide testimony in this matter. Haggerty's report has been provided. Exhibit 3. The report discloses the following, opining that Plaintiff:

1. "Did not provide the original version of the audio recording."

2. "Did not provide an audio recording that contained the same content that was recorded when the incident occurred."

3. "Did not provide all electronic media that was used to store, create or modify the audio recording that was created when the incident occurred."

Exhibit 3, p. 15.

Conspicuously absent from the report is any indication of any actual destruction of evidence or secreting of any relevant facts due to the methods in which Plaintiff preserved the authenticated audio recordings. Also absent is any allusion or indication as to how the Police Defendants have been prejudiced by any of the facts cited by Haggerty. Finally, and most importantly, any contention that there is anything in the report rendering a fact of consequence more or less likely in the determination of this matter does not appear.

### III. PREREQUISITES TO ADMISSION TO EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702 (2010). Items (1) and (3) of Federal Rule 702 were added in December of 2000 in order to codify the principles enunciated by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Under F.R.E. 702, Daubert and the expanded application of the rule as enunciated in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), courts are obligated to ensure that all testifying experts present testimony that is both methodologically sound and relevant to the facts of the case. Daubert, 509 U.S. at 590-91. In other words, a trial court is charged with ensuring that prior to the admission of expert testimony, the testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 2790.

If a proposed expert's testimony is challenged, the burden is on the party seeking to admit an expert's opinion to establish that all, "pertinent admissibility requirements are met by a preponderance of the evidence." F.R.E. 702 (advisory committee notes, (citing Bourjaily v. United States, 483 U.S. 171 (1987)). These "pertinent admissibility requirements" include the need for any expert opinion to be based upon sufficient facts or data, be a product of reliable methods, and be applicable to the facts of the case. F.R.E. 702.

A two-prong analysis is to be applied by courts in serving as the "gatekeeper" of appropriate evidence: 1) the testimony must consist of "scientific knowledge" — that is, the

testimony must be supported by appropriate validation (reliability); and the testimony must "assist the trier of fact to understand the evidence or determine a fact at issue." (relevance). See United States v. Dorsey, 45 F.3d 809, 813 (4th Cir. (Md.) 1995), cert. denied, 515 U.S. 1168 (1995) (quoting Daubert, 509 U.S. at 589-90). This required analysis applies to all aspects of an expert's testimony, including the facts underlying the opinion, the methodology, and the link between the facts and the conclusion drawn. Heller v. Shaw Indus. Inc., 167 F.3d 146, 155 (3d Cir. 1999). If either of these requirements is missing, as a "gatekeeper," it is the obligation of the court to deny the admission of the proffered expert testimony.

Applying these standards, if the Defendants cannot support, by a preponderance of the evidence, that their expert's opinions are reliable, then it is incumbent upon the Court to exclude their testimony under F.R.E. 702. Additionally, Defendants must demonstrate that the opinions would assist the trier of fact, but not supplant the trier of fact or merely impeach other witnesses. Dorsey, supra, at 815. Finally, in reference to Haggerty, some effect upon relevant evidence must be shown if his testimony is to assist the trier of fact.

Obviously, there are instances where "science" does not drive the basis for expert testimony. Nonetheless, when the area of inquiry is less "scientific", the trial judge remains charged with determining if the expert's testimony will satisfy this "reliable basis" standard consistent with the general knowledge and experience of the relevant industry. Kumho, supra at 526 U.S. at 149. Although a trial judge is granted broad discretion in this determination, the judge must keep in mind that the prevailing purpose of the reliability standard is to "make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Goebel v. Denver and Rio Grande

Western R. Co., 346 F.3d 987, 992 (10th Cir. 2003) (quoting Kumho Tire, 526 U.S. at 152); see also Smith v. Ingersoll Rand Co., 214 F.3d 1235, 1243 (10th Cir. 2000).

The United States Court of Appeals for the Fourth Circuit has enumerated several factors that the trial court should consider in evaluating whether a particular expert opinion properly satisfies the "reliability" prong of the test: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; (4) the degree of the method's or conclusion's acceptance within the relevant scientific community. United States v. Dorsey, 45 F.3d 809, 813 (4th Cir. 1995)(quoting Daubert, 509 U.S. at 593-94). Simply put, absent requisite reliability, the expert testimony should be excluded from trial. See e.g., Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 393 (D. Md. 2001)(excluding proposed expert who did not conduct a review of literature on the subject matter of testimony, and was never involved in any industry or government oversight of the subject matter); see also, In re Commercial Money Center, Inc., 737 F. Supp.2d 815 (N.D. Ohio, July 27, 2010) (granting a Daubert Motion where, among other things, the expert was unable to identify the specific documents upon which he relied to formulate his opinions; and "vast portions" of his report "go far beyond his experience and are based[3] primarily on legal analysis provided to . . . by his counsel," and where the report was "riddled with vague and unsupported statements").

---

[3] Notably, the Court of Appeals in Dorsey (a bank robbery case) affirmed the District Court's exclusion of forensic anthropologists who were offered to testify that the defendant was not the individual depicted in the bank's surveillance tape. Id. at 811, 814-15. In so ruling, the Court noted that the testimony failed to meet the Daubert factor of reliability because, inter alia, the methods or reasoning used by the proposed experts had never been tested and the conclusions had never been subject to peer review or publication. Id.

The foregoing presents only the issue surrounding the ability of an expert opinion to be accepted. Beyond that, other tests of admissibility must also be met. For example, only relevant evidence is admissible. F.R.E. 402. Relevant evidence is evidence which "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." F.R.E. 401. Thus, if an expert's testimony would not affect a fact which is of consequence in determining the action, it is irrelevant and inadmissible. The same is true of the opinion if is more prejudicial than probative. F.R.E. 403.

## IV. ANALYSIS

### A. HODGE CANNOT GET PAST THE GATEKEEPER STAGE FOR EXPERT TESTIMONY AND SHOULD BE EXCLUDED FROM TESTIFYING

### 1. HODGE'S OPINION IS UNRELIABLE

Looking to his opinions, Hodge states, "As an invitee within the standards of care in the security industry, Mr. Mills was owed a duty of reasonable (sic) from foreseeable risks of harms and as an invitee; that duty is subject to revocation by those who control the premises." The statement by Hodge is that a business can revoke the duty of reasonable care owed to a business invitee. No, they can't. The duty is a status duty, and if one is an invitee, the duty appertains regardless of an attempt to revoke the duty. It is as if Hodge is stating that a business can say, 'We choose to not act reasonably towards people in our establishment, and revoke the age-old duty of due care.' There is no such power. The statement is ridiculous.

The status of, and duties owed to, a person on the land of another was explained in <u>Wagner v. Doehring</u>, 315 Md. 97, 102, 553 A.2d 684, 686, (Md. 1989), as follows:

> A landowner must use reasonable and ordinary care to keep the premises safe for an invitee, defined as one permitted to remain on the premises for purposes related to the owner's business. A licensee by invitation is a social guest and is

owed a duty of reasonable care and must be warned of known dangerous conditions that cannot reasonably be discovered. A bare licensee is one who enters upon property, not as a social guest, but for his or her own convenience or purpose and with the landowner's consent. No duty is owed to a bare licensee except that he or she may not be wantonly or willfully injured or entrapped, nor may the occupier of land create new and undisclosed sources of danger without warning the licensee. Under some circumstances, the landowner may be liable to a bare licensee for a dangerous condition known to the landowner.

Finally, a trespasser is one who intentionally and without consent or privilege enters another's property. No duty is owed, except to refrain from willfully or wantonly injuring or entrapping the trespasser. This rule of limited liability to trespassers permits a person to use his own land in his own way, without the burden of watching for and protecting those who come there without permission or right.

(Citations and internal quotes omitted). Hodge ignores and errs in failing to recognize that the status and corollary duties are established on entry. Id. He also never states the alleged status Plaintiff assumed on the purported revocation of invitee status. Reference to the facts, even the facts presented by Hodge, accepts that the Plaintiff was an invitee when he entered the premises. Wagner requires that for a person to be considered a trespasser, that person must **enter** the property "intentionally and without consent or privilege . . .." Id. Even Hodge, with his analysis, acknowledges that this class could not include the Plaintiff.

Again, accepting Hodge's analysis in his attempt to apply Maryland law, Plaintiff, therefore, must be either an invitee, a licensee by invitation, or a bare licensee, and cannot be a trespasser. Thus, the duty of care owed the Plaintiff is either a duty of "reasonable and ordinary care to keep the premises safe (invitee)," a "duty of reasonable care (licensee by invitation)," or a duty to refrain from "wantonly or willfully injur[ing] or entrap[ing] (bare licensee)." Id. The core event upon which the entire case turns is the fact that Plaintiff was "entrapped" by the Defendants. Hodge's allusion that there was no breach of any applicable standard of care, while conspicuously failing to identify the applicable standard of care, is soundly belied by the fact that Plaintiff was held without legal authority. A breach of each possible standard of care is evident,

9

and Hodge's opinion to the contrary is either a fabrication or an error. In either event, it is patently unreliable.

Turning to other specifics of Hodge's opinions versus reality, the lack of a reliable basis of analysis stands as evident, and in its gatekeeping capacity, the Court must exclude Hodge from testifying as an expert in this case. As discussed above, prior to accepting testimony from a proffered export, the Court must be assured that the putative testimony would be reliable. In light of the report submitted by Hodge, it is apparent that nothing he could or would say could be deemed reliable in any sense.

Hodge opines, "There are no facts in this case to support that Security in this matter inflicted offensive contact upon Mr. Mills at any time." Note that this "expert" literally and expressly states that there are "no facts." Hodge also alleges that the scope of the physical contact upon Plaintiff is limited to "placing one's hand under the [Plaintiff's] armpit . . .." Hodge Report, exhibit 2, p. 3. Hodge's false rendition of the scope of physical contact destroys any reliability in his report.

Attached as exhibit 6 are a series of stills taken from the lodged video allegedly viewed by Hodge in forming his opinions. In exhibit 6, Coulter can be seen grabbing Plaintiff's wrist and twisting it behind Plaintiff's back. This is not a mere difference of opinion, and the action appearing on authenticated video is unassailable. Lodged Video, cam 425 at 2:08:50-2:08:55. Indeed, the fact that Coulter "grabbed" Plaintiff is law of the case. See Memorandum Opinion, ECF 133, p. 2. Moreover, Coulter admitted at his deposition that he "grabbed" the Plaintiff. Coulter Deposition, exhibit 4, 34: 5-7. This is direct evidence of a harmful or offensive contact by Coulter upon Plaintiff. Hodge's statement that there is "no evidence" cannot be reconciled

with the indisputable facts, and having made patently false statements to reach his conclusions,

Hodge's opinions are not reliable in any sense of the word. The opinions must be excluded.

Hodge also decries any conclusion that the Police Defendants and the Casino

Defendants worked together, stating: "The facts are clear that the Security Staff of Maryland

Casino Live (sic) in no way train, agree upon, or work together in their respective employment

role." Obviously, Hodge was hired by the Casino Defendants, and these defendants were aware

that the Police Defendants were actually on the payroll of, and working for, the casino. See

Defendant Bilter's Answers to Interrogatories, exhibit 7, ¶ 1; Shapelow's Answers to

Interrogatories, exhibit 8, ¶ 1.  Defendants at all relevant times were working together and

necessarily knew they were working together. Here, the Police Defendants swear they worked

for the casino on its payroll and subject to its direction at the time of events. Interrogatory

Responses, exhibits 7, 8. The Casino Defendants and Coulter also acknowledge that the sole

goal of the Police Defendants was to fulfill a request of the Casino Defendants. Coulter

Deposition, exhibit 4, p. 57: 11-13; Bilter Deposition, exhibit 3, pp. 65-66; accord Shapelow

Deposition, exhibit 10, p. 27. It is impossible to maintain that an employee acting within the

course and scope of his employment and advancing the express goal of the employer is not

working with the employer, but this is Hodge's contention. Either Casino Defendants

knowingly provided Hodge with the false information that the Police Defendants were acting

exclusive of the Casino Defendants and solely in their capacity as police officers, or he

fabricated his facts and conclusions out of whole cloth. In either event, the reliability of his

report and opinions is irredeemably undermined. Hodge's report and Hodge's opinions are

contrary to acknowledged reality, and, therefore, lack any reliability.

Similar is Hodge's false fact that, "There are no facts to support that security detained Mr. Mills and bounded him to a particular area for an unreasonable time, nor did (sic) inform him at any time her (sic) wasn't free to leave." Hodge Report, Exhibit 2, p. 3, under "No False arrest . . ..". Coulter has testified that the reason that he 'grabbed' Plaintiff was because Plaintiff was not cooperating with verbal requests, and "didn't want to go with us to the room . . .." Coulter Deposition, exhibit 4, pp. 34-37, with the quotation at p. 37: 4-5. More pointedly, Coulter acknowledges that Plaintiff did not consent to go to the back room, and, in fact, protested the escort to the back room. Coulter Deposition, exhibit 4, p. 49. Clearly, by Casino Defendants' admissions, Plaintiff was "detained;" he was "bounded to a particular area;" and through the seizure, he was told that he "wasn't free to leave." Even Hodge acknowledges that Plaintiff showed "reluctance to follow security personnel to a hallway . . ..", and that the Casino Defendants, with physical contact, guided Plaintiff "to a particular area." Hodge Report, exhibit 2, p. 2. In light of Coulter's recognition that Plaintiff desired to avoid that particular area, there is direct and flagrant evidence, ignored by Hodge in rendering his opinions, that the Plaintiff was "bounded to a particular area." No reasonable trier of fact could find Hodge's statements truthful, they are demonstrably false, and there is no reliability to his report or his conclusions.

Then Hodge writes, "Maryland Casino Live Standard Operating Procedures is (sic) clear as it identifies is (sic) requirement to have police officers respond and **address violations of Maryland Law.**" Hodge Report, exhibit 2, p. 5 (emphasis added). This is a phantom statement without relevance, but offered to give a basis for the intervention of the Police Defendants. No one maintains that Plaintiff violated Maryland law in any way. Yet, Hodge supports the Casino Defendants' interaction with Plaintiff in reliance upon the ability to intervene in criminal activity. Without identifying any criminal activity (and the facts showing that there was no

criminal activity), the statement by Hodge can be read as a statement limiting, as opposed to authorizing, police or casino involvement of the type at issue here. Hodge, using this alleged truism to support the actions against the Plaintiff, relies on a premise which clearly shows that, in this case, there was no legal basis to summon the Police Defendants and hand Plaintiff's detention over to the Police Defendants. Hodge's report is unreliable in all respects because it is based on facts that do not exist and facts contrary to unassailable facts.

Then there is the ultimate failure in Hodge's 'legal' analysis. He further shows the lack of reliability to his analysis by basing his "standard of care" analysis upon the alleged policies and procedures of the Casino Defendants. Hodge ignores the applicable statutory and case law standards of care. For example, Md. CRIMINAL LAW Code Ann. § 3-502 provides, "A person may not, by force or fraud, . . .  cause a person to be carried . . . with the intent to have the person carried or concealed in or outside the State." Obviously, this provides a standard of care applicable to all persons in the state, including Casino Defendants, requiring that they shall not undertake actions which violate the statute.

Per Hodge, the Casino Defendants could eradicate the entire criminal law within the State of Maryland by merely adopting a policy conflicting with the mandatory statutory standards. For example, the Casino Defendants could adopt a policy of dismembering anyone who wins at their casino, and avoid assault, battery, and mayhem because they were merely following their adopted standard of care. Obviously, this is not the case, and Hodge has attempted to define away applicable standards of care without any legal, logical, or moral basis.

In a strange twist of circumstance, in one sense, Hodge is correct. The policies of the casino have been provided in discovery, the relevant portion being attached as exhibit 9. The procedures in exhibit 9 spell out the methods for eviction and ejection, with the applicable

portion for the Plaintiff being that of an eviction as distinguished from a single day ejection. The

procedures to which the Plaintiff was to be subjected for his eviction are stated in the policy as

follows:

> When receiving an . . . eviction notification from a supervisory employee, security will:
>
> 1) Immediately contact Surveillance and the Security Supervisor/Shift Manager. Give location and patron description.
> * * *
> 5) Supervisor [here, Coulter] will approach patron and advise them of the problem or offense and notify the patron of the . . . eviction.
> * * *
> 7) If an . . . eviction of a patron(s) is required, the **Security Supervisor will escort patron(s) to the holding room** and Security Supervisor will contact Surveillance immediately that patron is in the room. If only an ejection is required, the Security Supervisor will obtain the name of the patron for reporting purposes and elect to forgo the holding room step.
>
> 8) The person **being detained** will be patted down for any possible weapons only if there is probable cause to believe the person is in possession of a weapon.  . . .
>
> 9) For anyone being evicted, the Security Shift Manager . . . **will read the individual the eviction notice and ask the individual to sign the notice** (patron does not have to sign the report).
>
> 10) Ideally, **this reading will take place in the holding room** so that it can be video **and audio** recorded for possible future prosecution.

Exhibit 9, (emphasis added). This policy confirms that the Casino Defendants recognize the

interaction with the Plaintiff as a detention, provides express and apparently mandatory

directives to the personnel to detain individuals under the casino's policies, and provides for a

necessary appreciable duration of the detention (to the holding room and through the time of

fulfilling the eviction notice requirements). In comparison with the Lodged Video and the Public

video/audio, Hodge recognizes that the policies of the Casino Defendants were followed, and a

compelled detention of the Plaintiff was within these policies. Contrary to Hodge's conclusion,

the clear import of these policies is that the Casino Defendants have institutionalized the

commission of intentional torts against patrons.

14

But, as noted, these policies have little or nothing to do with the standard of care applicable to the Casino Defendants. For the intentional tort of false imprisonment, the applicable standard of care is whether the detention was undertaken under "legal authority." In other words, for Hodge to apply the proper standard, he must recite the policies, and then provide the "legal authority" for the enactment and enforcement of the policies. The opinion is devoid of any legal authority for the detention, and no applicable standard of care is supplied in Hodge's opinions.

This carries over to the other intentional torts as well. Neither reasonableness nor good faith is a defense to an intentional tort. Strei v. Blaine, 996 F. Supp. 2d 763, 797, 2014 U.S. Dist. LEXIS 17462, *83 (D. Minn. 2014); Restat. 2d of Torts, § 44 (2nd 1979); accord, Montgomery Ward v. Wilson, 339 Md. 701, 731, 664 A.2d 916, 931 (Md. 1995). Hodge appears to attempt to provide an excuse in that the interaction with the Plaintiff was addressed expeditiously. However, that is not defense, and a detention without legal authority is tortious so long as the detention is of any appreciable duration. State v. Dett, 391 Md. 81, 91, 891 A.2d 1113, 1119 (Md. 2006); Green v. Donroe, 186 Conn. 265, 267, 440 A.2d 973, 974, (Conn. 1982)("Any period of . . . restraint, however brief in duration, is sufficient to constitute a basis for liability."); Rehberger v. State, 235 Ga. App. 827, 828, 510 S.E.2d 594, 596 (Ga. Ct. App. 1998); Jackson v. Town of Bloomfield, 2015 U.S. Dist. LEXIS 33331, *72, 2015 WL 1245850 (D. Conn. Mar. 18, 2015).[4] To reach his conclusions, Hodge, necessarily, ignores this binding law. Again, there can be no reliability to his opinions.

Highlighting the incompetence of Hodge's opinions is the case law and common law on

---

[4] Incidentally, this was a detention of an appreciable duration. It lasted over seventeen minutes at an absolute minimum. See Lodged Video, cam 425 at 2:08:50-cam 565 at 2:26:28

the torts Plaintiff alleges. The legal authority for a casino to detain a patron is entirely encompassed as follows:

1. A citizen's arrest for a felony. This requires, "reasonable grounds exist to believe that a felony has been committed and that the person being apprehended has committed it."

2. A citizen's arrest for a misdemeanor. This requires that an actual misdemeanor "is being committed in the presence or view of the arrester which amounts to a breach of the peace."

Stevenson v. State, 287 Md. 504, 516, 413 A.2d 1340, 1347 (1980); and In re Albert S., 106 Md. App. 376, 396, 664 A.2d 476, 486 (1995), respectively. A detention without legal authority is a false imprisonment. Green v. Brooks, 125 Md. App. 349, 367, 725 A.2d 596, 605 (Md. Ct. Spec. App. 1999). This provides an immutable standard of care applicable to casinos requiring that they cannot detain an individual absent legal authority to do so. Nothing in Hodge's report alludes that the Casino Defendants held legal authority to detain the Plaintiff, and Hodge's alleged statement of the standard of care applicable in the circumstances presents a patent misstatement of the law, and there is no opinion of any value to the trier of fact forwarded by Hodge. Per the gatekeeper function, his testimony should be excluded.

## 2. HODGE'S OPINION INVADES THE EXCLUSIVE PROVINCE OF THE JURY

Of equal import, the law will be read to the jury in the jury instructions. This is a simple case of applying the law to the facts. Nothing about Hodge provides him with any ability greater than the jury to undertake this exercise. "To be admissible, expert testimony must 'help the trier of fact to understand the evidence or to determine a fact in issue.' The helpfulness requirement of Rule 702 thus prohibits the use of expert testimony related to matters which are 'obviously . . . within the common knowledge of jurors.'" United States v. Lespier, 725 F.3d 437, 449 (4th Cir. N.C. 2013)(citations omitted); accord Spencer v. General Electric Co., 688 F. Supp. 1072, 1076, (E.D. Va. June 23, 1988). Is it the jury's province to determine whether there is evidence of a

harmful or offensive touching by Coulter? Obviously, yes. But Hodge's opinion steps directly into this role and attempts to circumvent the jury's function (here, even to the point of fabricating the conclusion). Casino Defendants present Hodge as some sort of super-juror, with prescience superior to the jury to reach conclusions on the evidence. Further, to reach this result, as noted above, Hodge either ignored the evidence or the Casino Defendants fed him false evidence (i.e., there was no relation between the Police Defendants and the Casino Defendants even though the Police Defendants were literally working for, and on the payroll of, the Casino Defendants). Hodge's opinions here will not help the jury, but only at most, risk usurping the jury of its function. Hodge should be stricken as an expert.

### B. HAGGERTY CANNOT GET PAST THE GATEKEEPER STAGE FOR EXPERT TESTIMONY AND SHOULD BE EXCLUDED FROM TESTIFYING

Through two discovery conferences and provision of scads of material, it has always been difficult, approaching impossible, to discern the relevance of the issues surrounding the now proffered testimony concerning Haggerty. Haggerty offers three opinions upon which he will allegedly testify, to wit:

1. Plaintiff did not provide the original version of the audio recording.

2. Plaintiff did not provide an audio recording that contained the same content that was recorded when the incident occurred."

3. Plaintiff did not provide all electronic media that was used to store, create or modify the audio recording that was created when the incident occurred."

Haggerty Report, exhibit 1, p. 15. These conclusions do not impact the evidence in this case at any level, and are entirely irrelevant.

Perhaps most pertinent here concerning these opinions is the fact that, were Plaintiff asked any of these questions, he would answer in full accord with Haggerty's opinions. For example, if Plaintiff were asked, "Did you provide the original version of the audio recording?",

Plaintiff's answer would be no. There is no disagreement here. Plaintiff explained what was provided, which was a copy of the original recording sans silence on the original recording. See exhibit 5, ⁋ 10. That is, he does not have, and did not provide, the original recording. An opinion that is undisputed at any level, and even admitted, does not provide the jury with any additional information. This analysis also applies exactly to opinion number 2 stated by Haggerty. Plaintiff agrees that the content was different in that periods of silence were deleted from the audio provided. See exhibit 5, ⁋ 10.

As to opinion number three, there was one original audio recording made. The only modification ever made to this audio was explained as Plaintiff removing silence from the recording so as to better manage it during repeated listenings on his return taxi ride the night of the incident. Other than this modification, the copies provided have always been exact copies from what remained on the iPhone, and the audio was never subsequently modified. Thus, all three opinions of Haggerty are opinions which Plaintiff does not dispute, and if the same questions answered by Haggerty were posed to the Plaintiff, his answers would match Haggerty's. This is, obviously, not something requiring an expert, and the opinions of Haggerty add nothing to the proofs or prospective proofs.

Police Defendants have alluded that the evidence is relevant to spoliation. "Spoliation" is defined as "the destruction of evidence. . .. The destruction, or the significant and meaningful alteration of a document or instrument. Spoliation occurs when evidence relevant to prospective civil litigation is destroyed, adversely affecting the ability of a litigant to prove his or her claim." Patel v. OMH Med. Ctr., Inc., 1999 OK 33, 46, 987 P.2d 1185, 1202, (1999). Obviously, before any type of spoliation instruction or consideration of spoliation at any level occurs, there must be 1) a showing that there was a destruction or significant or meaningful alteration of evidence; and

2) the event adversely affected the ability of the opposing litigant to prove his or her claim. Even with Haggerty's opinion, neither of these circumstances can be met by the Police Defendants, and there is no spoliation issue to address.

Nothing in Haggerty's report indicates that the Plaintiff destroyed or significantly altered any meaningful evidence. Indeed, Haggerty states, "Without the original version of the audio file, it is impossible to compare or prove what edits were made, or what conversations are missing from the supplied audio file." Haggerty Report, exhibit 1, p. 14. As has been repeatedly and consistently stated, the original recording was on Plaintiff's iPhone, which no longer exists. Thus, Haggerty's opinion is, effectively, that from extant recordings, it is unknown and unknowable whether any material conversations are missing from the audio recording provided.

This absence destroys the ability to claim any spoliation. Specifically, it is the Defendants' burden to show that there was an alteration or a destruction, and the statement that it is unknown whether there was an alteration or a destruction falls far short of this prerequisite. Defendants have nothing, and Haggerty is opining on a chimera.

More to the point, nonetheless, is the absence of any contention that something pertinent was deleted in any fashion. For spoliation to occur, there must, minimally, be some contested issue of fact which the spoliated evidence would impact. There is no contested or disputed issue of fact at any level concerning the matters before the Court. Do the Police Defendants contest the statements on the Public video/audio? To the contrary, they acknowledge the statements and their accuracy. Is there a contention that something was said which was not captured? Originally, Police Defendants alluded that Plaintiff was attempting to hide the fact that he was told to not record in the hallway. But Plaintiff was never asked and never sought to hide this. Indeed, once asked, he did not deny that he was told to not record in the hallway. See ECF 125. To the extent

that this has ever been raised, Plaintiff here acknowledges that he was told to not record. There is

no question of fact raised at any level regarding what was, or was not, said between the parties,

and the opinion of Haggerty presents mere surplusage restating that to which the parties already

agree.

The other problem, as noted elsewhere, is that Haggerty is simply wrong in his analysis.

Haggerty states, "It is impossible to compare or prove what edits were made, or what

conversations are missing from the supplied audio file." It most certainly is not impossible.

There were persons present during the entirety of events concerning the Plaintiff. Defendants can

ask them what conversations, if any, are missing from the supplied audio file (and presumably

have done so). Both Bilter and Shapelow, as well as Plaintiff and Coulter, have testified that the

recording is accurate, and no one has pointed to any omissions in the recording for times where it

was known that the recording was occurring.[5]

"A spoliation sanction is proper where (1) a party has a duty to preserve evidence

because it knew, or should have known, that litigation was imminent, and (2) the adverse party

---

[5] Defendants did attempt to claim that there is an indication that the Plaintiff was told to not record, which statement does not appear on the audio. Plaintiff has stated and admitted the that this statement was made by Maryland Live personnel prior to recording commencing, and does not deny that he was so told. He also explained, with reference to the Lodged Video as well, that the recording had yet to commence at the time of this statement. See ECF 125, ⁋ 1. To confirm this with the audio, the Court could look to Lodged Video, cam 565. At 2:10:10, Plaintiff first removes his phone from his pocket, but does nothing other than hold it, and returns it to his pocket. At 2:11:40, Plaintiff again removes his phone. He begins to fritter with its controls, and is likely setting up to record. He is then spoken to by a security guard, and this is where he is told that he cannot record. Plaintiff appears to stop addressing his phone and puts it in his pocket. Instead, Plaintiff has then (after being told he cannot record) returned the phone to his pocket and commences recording at approximately 2:12:09. Also, consistent with the Plaintiff's rendition, there appears very little speaking, all distant, until the Police Defendants arrive. In short, the person of whom Police Defendants could discover all communications are evident on the video, the scope of the recording and the recording being complete is consistent with the video evidence, and there is no indication of anything missing from the audio save silence, and Haggerty does not and cannot dispute this.

was prejudiced by the destruction of the evidence." <u>Burlington Northern & Santa Fe Ry. v.</u>

<u>Grant</u>, 505 F.3d 1013 *, 2007 U.S. App. LEXIS 22680, 37 ELR 20258 (10th Cir. Okla. 2007). If

the allegedly spoliated evidence is available from another source, by definition, there is no

prejudice. <u>See</u> <u>Ewald v. Royal Norwegian Embassy</u>, 2014 U.S. Dist. LEXIS 46787 * (D. Minn.

Mar. 7, 2014). That presents the case here, and there is no legitimate spoliation issue raised by

Haggerty or appearing in this case.

Here, every person speaking during the recording by Plaintiff is present and identifiable

on the lodged video. Concerning persons present during recording, Police Defendants have taken

the deposition of Plaintiff. The deposition of Defendants, Bilter, Shapelow, and Coulter have

also been taken, and the Police Defendants proffered no questioning of any of these individuals.

All persons present during the recording confirm the accuracy and occurrence of the audio

recorded by Plaintiff. The other security personnel present during the recording have also been

identified. Police Defendants have not taken any deposition of these persons, and have not

provided any expected contested testimony by these individuals. Simply, all of these individuals

and their words are apparently discoverable in the ordinary course. Thus, all words said during

the detention of the Plaintiff spoken by all persons involved in the detention of the Plaintiff are

"available from another source." Under the law, there is no prejudice to the Police Defendants

related to any omission of any audio recorded by the Plaintiff because the evidence remains

available. With no prejudice, there can be no spoliation.

Finally, what could have possibly been said that changes a fact of consequence in any

respect? Plaintiff admits he was card counting. Plaintiff admits he was told to not record.

Plaintiff was expressly told he could not leave until he provided his identification. Coulter admits

that he summoned his Police Defendant co-workers to compel Plaintiff to produce identification.

The Police Defendants agree that their charge was to get the Plaintiff's identification. This, together with the authenticated audio, covers all the communications relevant to the issues in this matter. Haggerty's opinions and analysis will not assist the trier of fact in any fashion, and his opinions are inadmissible. There is no identified communication allegedly not captured on the audio, and his opinions are irrelevant and inadmissible. There is also direct evidence (Plaintiff's answers to interrogatories) that there was no spoliation or alteration of any audio save for deletion of silence, and no evidence to the contrary. There is, simply, no substance to the assertions of the Police Defendants concerning spoliation, and Haggerty's putative testimony is of no import to this matter. He should be stricken as a witness under this Court's gatekeeping function.

## V. CONCLUSION

For the reasons set forth above, this Court should exercise its gatekeeping function and exclude (strike) Hodge and Haggerty as expert witnesses in this matter.

Dated this 11th day of May, 2017

Respectfully submitted:

/S/ *Abraham F. Carpio*
Abraham F. Carpio, 25443
Carpio Law Firm, LLC
Prince George's Professional Park
3311 Toledo Terrace, Suite B 201
Hyattsville, MD  20728
(301) 559-8100
carpiolaw@gmail.com
*Counsel for Plaintiff*

/ / /

/ / /

/ / /

Nersesian & Sankiewicz

*/S/ Robert A. Nersesian*_____
Robert A. Nersesian
528 S. 8th
Las Vegas, NV  89101
(702) 385-5454
vegaslegal@aol.com
*Pro hac vice counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11th, I served a copy of the foregoing Memorandum

in Support of Plaintiff's Motion in Limine to Strike Defendants' Experts through the CMECF

system maintained by this court upon the following attorneys:

Jay H. Creech, Senior Assistant County Attorney      Michelle J. Marzullo/Patricia H. Beal
Anne Arundel County Office of Law                    Marks, O'Neil, et al
2660 Riva Road, 4th Floor                            600 Baltimore Ave, Ste. 305
Annapolis, MD 21401                                  Towson, Maryland 21204

*/S/ Robert A. Nersesian*_____
Robert A. Nersesian