# EXHIBIT 3

EXHIBIT 3

Transcript of

**Douglas Bilter**

Date: Friday, February 24, 2017

Phone: 1-866-337-6778
Fax: 410-268-7006
info@corbinreporting.com
www.corbinreporting.com





*- Specializing in Interactive Realtime & Rough ASCII Transcripts -*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF MARYLAND

 3     JUSTIN MILLS,

 4              Plaintiff                    Case No.

 5         vs.                               RDB 15-495

 6     ANNE ARUNDEL COUNTY,

 7     MARYLAND, ET AL,

 8              Defendants

 9     _____/

10              Pursuant to Notice, the deposition of

11       DOUGLAS BILTER was taken on Friday, February

12       24, 2017, commencing at 9:58 a.m., at the

13       offices of Anne Arundel County Office of Law,

14       2660 Riva Road, 4th Floor, Annapolis, Maryland

15       21401 before David C. Corbin, a Registered

16       Professional Reporter and Notary Public.

17

18

19              Corbin Reporting and Video

20              Serving MD, DC, No.VA & DE

21            REPORTED BY:  David Corbin, RPR
```

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017
Pages 38–41

**Page 38**

1   first class.
2   Q.  And what -- all right.  Walk me through
3   the Anne Arundel County police department.  You've
4   been hired, you're at the Academy, what is your
5   title?
6   A.  Recruit police officer or police cadet.
7   Q.  You graduate.  Now what are you?
8   A.  Police officer.
9   Q.  Okay.  And you get your first promotion,
10  now what are you?
11  A.  Police Officer First Class.
12  Q.  Next promotion?
13  A.  Corporal.
14  Q.  Promotion after that?
15  A.  Sergeant.
16  Q.  And promotion after that?
17  A.  Lieutenant.
18  Q.  And after that?
19  A.  Captain.
20  Q.  Is there one after that?
21  A.  There is many more after that.  But the

**Page 39**

1   order of which they are, I wouldn't be able to tell
2   you.
3   Q.  What's the top dog?
4   A.  The Chief of Police.
5   Q.  Chief.  And I would then guess going
6   backwards an Assistant Chief of Police and on down
7   to where you finally reach Captain too?
8   A.  Yes.
9   Q.  Are you at a specific post?
10      MR. CREECH:  Objection.  What point in
11  time?
12  A.  No.
13  Q.  When you were meeting with Mr. Mills.
14      MR. NERSESIAN:  Good objection.  Thank
15  you.
16  A.  I was not at a post because I was not
17  working for the County at the time.
18  Q.  The day before and the day after were you
19  working for the County?
20  A.  I don't know, I would have to look at my
21  schedule.

**Page 40**

1   Q.  Let's not talk about -- let's not use the
2   word working for.  Were you employed by the Anne
3   Arundel Police Department, whatever other employment
4   you might have had as well, when you met with
5   Mr. Mills?
6       MR. CREECH:  Objection.  Go ahead.
7   A.  Yes.
8   Q.  Okay.  And what office building or place
9   was your home base with Anne Arundel County's
10  employment of you?
11      MR. CREECH:  At the time he interacted
12  with Mr. Mills, right?
13      MR. NERSESIAN:  Yes.
14  A.  I believe I was at Eastern District at
15  that point.
16  Q.  Where is that?
17  A.  The police station for Eastern District
18  is -- was a different building than it was now.  We
19  have a newer building.  The current address is 204
20  Pasadena Road.
21  Q.  Sorry?

**Page 41**

1   A.  204 Pasadena Road is the current Eastern
2   District building.
3   Q.  And is that where you are today?
4   A.  Yes.
5   Q.  Have you been anyplace else in the
6   interim?
7       MR. CREECH:  You mean other districts?
8   A.  I have worked at Northern District before
9   Eastern.  When I switched over, I couldn't tell you
10  right now.
11  Q.  Do you do ongoing training with Anne
12  Arundel?
13  A.  Inservice training, correct.
14  Q.  What about -- does that include coursework
15  and classwork?
16  A.  I don't know what that would entail.
17  Q.  When did you become a Corporal?
18  A.  2000 -- about -- I would say about 2014,
19  2015.
20  Q.  Okay.  Enjoying it?
21  A.  As much as I can.

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017
Pages 42–45

Page 42

1  Q. When you're working for Anne Arundel
2  County as a police officer, what are your ordinary
3  duties?
4      A. To patrol.
5      Q. You're a patrol officer?
6      A. Correct.
7      Q. Generally in a car?
8      A. Yes.
9      Q. Okay. Do any motorcycle?
10     A. No.
11     Q. Bicycle?
12     A. No.
13     Q. Foot?
14     A. From time to time.
15     Q. You know the guy at the end of the table
16  down there?
17     A. I do.
18     Q. Who is that?
19     A. That is, I believe, PFC Shapelow.
20     Q. So you said PFC Shapelow?
21     A. Police Officer First Class is what PFC

Page 43

1  stands for.
2      Q. POC you said?
3      A. PFC.
4      Q. Police officer with an F?
5      A. First Class. PFC.
6      Q. Do you guys have partners when you're
7  patrol officers?
8      A. No.
9      Q. No. Had you worked with Mr. Shapelow
10  before the night that you ran into Mr. Mills?
11     A. Yes, I believe so, a couple times.
12     Q. Had you ever worked together while working
13  on regular shift hours with Anne Arundel police?
14     A. No.
15     Q. Had you worked with him solely at Maryland
16  Live Casino before this?
17     A. I believe so.
18     Q. Have you watched the You Tube video of the
19  interaction between you and Mr. Mills?
20     A. I have.
21     Q. And I'm talking about the one with audio?

Page 44

1      A. Yes.
2      Q. Okay. Have you watched it more than once?
3      A. That would be a fair statement.
4      Q. When did you first watch it?
5      A. When I heard about the incident from a
6  coworker of mine that said, "hey, you're on You
7  Tube."
8      Q. I've been sitting here before with
9  somebody in your position and generally that first
10  conversation is by a coworker saying "hey, did you
11  know you're famous." Is that what you got?
12         MR. CREECH: Objection. Go ahead.
13     A. Something to that essence.
14     Q. Did you review anything in preparation for
15  your deposition here today?
16     A. Besides the video?
17     Q. Besides the video.
18     A. The respondent questions that we've
19  submitted to you.
20     Q. Anything else?
21     A. No.

Page 45

1      Q. Okay. What video did you review?
2      A. The video that was provided.
3      Q. And the You Tube video as well?
4      A. Yes. That's the one I'm referring to.
5         MR. CREECH: Objection. Unclear. Go
6  ahead.
7      Q. A You Tube video with audio?
8      A. Yes.
9      Q. Okay. And when did you review that?
10     A. The first time?
11     Q. No, the last time now.
12     A. Maybe earlier this week.
13     Q. Was there anything seen on the video that
14  you reviewed, I'm not saying the audio right now,
15  the video that you reviewed, while you were present
16  which you contend did not occur?
17        MR. CREECH: Objection. Go ahead.
18     A. The video seemed to be -- the video
19  portion of it seemed to be, I guess, pretty
20  accurate.
21     Q. Was there anything you heard on that video

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017                                    Pages 46–49

*Page 46*

1  while you were present, on that video while you were
2  present on that video, which you contend was not
3  said?
4      MR. CREECH: Objection. Go ahead.
5  A.  As far as what you can hear?
6  Q.  Yes.
7  A.  Some of it is un -- you can't really hear
8  everything but --
9  Q.  Everything that you can hear --
10     MR. CREECH: Objection. You're talking
11     over him.
12     MR. NERSESIAN: You're right, I am,
13     because he's changing the question. I want to
14     make sure the question is clear.
15     MR. CREECH: Thank you.
16  Q.  Of everything that you can hear said on
17  that video, is it your contention that some of that
18  was not actually said?
19     MR. CREECH: Objection. Go ahead.
20     MS. BEALL: Objection.
21  A.  No, everything that you can hear was said.

*Page 47*

1  Q.  Have you tried to fill in the parts that
2  you can't understand?
3      MR. CREECH: Objection. Go ahead.
4  A.  What do you mean by that?
5  Q.  Well, you said there are parts while
6  you're on the video that you can't understand that
7  are -- and my question is have you tried to recall
8  what was said during those parts so that it could be
9  clearer?
10 A.  No, I don't think so.
11 Q.  All right. Now, I understand from your
12 responses to the interrogatories that you were
13 actually in the employ of Maryland Live at the time
14 of the events seen on the You Tube video. Let's
15 call it the Mills events. And we will refer to the
16 Mills events as that period of time in which you and
17 Mr. Mills were present together at Maryland Live
18 Casino, okay?
19 A.  Okay.
20 Q.  Now, I understand that at the time of
21 Mills events you were actually in the employ of

*Page 48*

1  Maryland Live; is that correct?
2  A.  That's correct.
3  Q.  Are you okay?
4  A.  I'm just adjusting.
5  Q.  That hurt me.
6      MR. CREECH: Did I miss something?
7      MR. NERSESIAN: Your client --
8      MR. CREECH: Let's go off the record.
9      (Off the record colloquy.)
10 BY MR. NERSESIAN:
11 Q.  How much were you being paid?
12 A.  At the time, I don't recall. Because we
13 had gotten a few raises.
14 Q.  Okay. Well, give me an idea.
15 A.  Ball park, let's say --
16     MR. CREECH: Objection. Go ahead.
17 A.  I would say $35 an hour to $40 an hour.
18 Q.  Do you still work for Maryland Live at
19 times?
20 A.  I do.
21 Q.  Do you know if Mr. Shapelow does?

*Page 49*

1      MR. CREECH: I didn't catch the question.
2  Q.  Do you know if Mr. Shapelow still works
3  for --
4  A.  I don't know. We have varying shifts. I
5  don't know if he's still there or not.
6  Q.  Okay. So it's luck of the draw who you
7  end up with on any given night?
8  A.  True.
9  Q.  How many police officers to your
10 understanding does Maryland Live employ on any
11 shift?
12     MR. CREECH: Objection.
13     MS. BEALL: Objection.
14     MR. CREECH: Basis of knowledge. Go
15     ahead.
16 A.  I don't know. You mean how many officers
17 are working at one time?
18 Q.  Yes.
19 A.  Generally two.
20 Q.  So you're not with Anne Arundel County at
21 this time, you're with Maryland Live and you're on

Page 50

1 their payroll. Who is your boss?
2     MR. CREECH: Objection.
3     MS. BEALL: Objection.
4     MR. CREECH: Go ahead.
5  A. The casino.
6  Q. Who is your physical human boss?
7     MR. CREECH: Objection. You mean at this
8  specific point?
9     MR. NERSESIAN: While working for Maryland
10 Live Casino.
11    MR. CREECH: It may have changed. You
12 mean during the Mills incident?
13    MR. NERSESIAN: Yes.
14    MR. CREECH: Got it. Thank you.
15 A. I guess -- I don't know, it depends on
16 what you're asking of -- like if I need to speak
17 with somebody regarding something?
18 Q. You're working security at Maryland Live,
19 right?
20 A. Correct.
21 Q. Okay. Is there somebody who would be the

Page 51

1 security manager onsite?
2 A. Yes. At Maryland Live, yes.
3 Q. Would that be your boss for that shift?
4 A. I don't know that I would consider him my
5 boss. But in essence if I had an issue with the
6 casino, I could speak with him, yes.
7 Q. Well, you're working for the casino,
8 right?
9 A. Yes.
10 Q. You report to somebody if you're working
11 for them, right?
12 A. Yes.
13 Q. Who do you report to?
14 A. We don't have a physical person because
15 they constantly change. Whoever is on shift.
16 Q. And that would be the shift manager on
17 shift for security, right?
18    MR. CREECH: Objection. Go ahead.
19 A. I guess you could say that.
20 Q. Well, who else might it be?
21 A. What do you mean?

Page 52

1 Q. If it's not that person that you're
2 reporting to and working for, who is it?
3 A. It would be them if I had an issue at the
4 casino, correct.
5 Q. And how does the position that you have --
6 strike that. You recognize when you were working
7 for security at Maryland Live that there are other
8 people there called security officers?
9 A. Yes.
10 Q. And there's usually also a security
11 manager or somebody in that role?
12 A. Yes.
13 Q. How is your position different from that
14 of a security officer?
15    MR. CREECH: Objection.
16    MS. BEALL: Objection.
17 Q. In the employ of Maryland Live?
18    MR. CREECH: Objection. Go ahead.
19 A. I don't know.
20 Q. You may just be, since you're working for
21 security, another security officer. Fair statement?

Page 53

1    MR. CREECH: Objection.
2    MS. BEALL: Objection.
3    MR. CREECH: Go ahead.
4 A. Yes.
5 Q. Okay. Except there is a difference. When
6 we look at that video, what's that uniform you're
7 wearing?
8 A. That's an Anne Arundel County police
9 department uniform.
10 Q. Did you have a badge on?
11 A. I do.
12 Q. In the video?
13 A. Yes.
14 Q. Okay. You don't have a badge with you
15 right now, do you?
16 A. No.
17 Q. What about in your wallet?
18 A. No.
19 Q. No?
20    MR. NERSESIAN: Can we go off the record a
21 second.

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017
Pages 54–57

Page 54

1   (Off the record colloquy.)
2  BY MR. NERSESIAN:
3   Q.  The badge that you had on during the Mills
4  event, tell me -- strike that.  You see that
5  Mr. Shapelow has a badge.  Is that the same type of
6  badge that you had on?
7   A.  Similar, yes.
8   Q.  Okay.  What's it say on it?
9   A.  I can not read it from here.  Police
10 officer, Anne Arundel County, Maryland.
11  Q.  Can I see it.  Okay.  Thank you.  Now, I
12 don't know what Mr. Shapelow's weapon of choice is,
13 but he's got one on his hip right now.  Did you have
14 one on your hip during the Mills incident?
15  A.  Correct.
16  Q.  And would that have been your Sig Sauer?
17  A.  Yes.
18  Q.  Mr. Coulter has been identified as the
19 security manager onsite at the time of the incident.
20 Was that your understanding?
21  A.  Yes.

Page 55

1   Q.  Now, at the same time while you're working
2  for Maryland Live, on other shifts -- strike that.
3  Was your employment with Anne Arundel County
4  full-time at the time of the Mills incident?
5       MR. CREECH:  Objection.  Go ahead.
6   A.  Yes.
7   Q.  Okay.  Forty hours a week plus OT when
8  requested?
9   A.  Generally more than that, but yes.
10  Q.  Okay.  Well, isn't anything over 40
11 overtime?
12      MR. CREECH:  Objection.  Go ahead.
13  A.  No.  We have a different schedule so we
14 work about 60 hours, but then the next week we will
15 work like 40.  It varies.  It's complicated, hard to
16 go over right now.  Yes, we generally work at least
17 more than 40 hours every week.
18  Q.  Okay.  In your job with Anne Arundel did
19 you have a boss at the police department?
20  A.  Yes.
21  Q.  And who was that at the time of the Mills

Page 56

1  incident?
2       MR. CREECH:  You mean his immediate
3  supervisor?
4       MR. NERSESIAN:  Yeah.
5       MR. CREECH:  Thank you.  Just want to make
6  sure.
7   A.  I don't recall to be honest.  We've gone
8  through a lot of supervision.
9   Q.  Would that have been a Corporal or a
10 Sergeant?
11  A.  It would have been a Sergeant.
12  Q.  Did you ever contact the Sergeant in any
13 fashion about your interaction with Mr. Mills?
14  A.  No.
15  Q.  Tell me how you first became aware of
16 Justin Mills?
17  A.  We were contacted by someone in the casino
18 saying "hey, we have a gentleman, we need you back
19 at this location", and we responded there.
20  Q.  So you had heard nothing about Mr. Mills
21 until he was, from your recollection, already in the

Page 57

1  back hallway?
2       MR. CREECH:  Objection.  Go ahead.
3   A.  That's correct.  That's correct.
4   Q.  Now, when you watch the video you see
5  Mr. Coulter step out of the hallway.  Let's call it
6  the hallway, because that's what it's labeled on the
7  videos.  You see Mr. Coulter step out of the
8  hallway.  And then return with you and Mr. Shapelow.
9  The question is did you meet Mr. Coulter outside of
10 the hallway?
11  A.  That's correct.
12  Q.  Okay.  Do you have any understanding how
13 Mr. Mills got into that room?
14      MR. CREECH:  Objection.
15  Q.  The hallway?
16      MR. CREECH:  Objection.  Go ahead.
17  A.  No.
18  Q.  So you didn't know if he was there
19 voluntarily or if he had been forced there --
20      MR. CREECH:  Objection.
21  Q.  -- before you went in?

Page 58

1  MR. CREECH: Objection. This is not a
2  speaking objection. The question is other than
3  conversations with counsel, correct?
4  MR. NERSESIAN: I'm talking about his
5  knowledge at the time.
6  MR. CREECH: His knowledge at the time.
7  Fine. Okay.
8  Q. Did you have any knowledge as to whether
9  or not Mr. Mills, and this is at the time of the
10  incident, before you entered the hallway, did you
11  have any knowledge as to whether or not he was there
12  voluntarily or involuntarily?
13  MR. CREECH: Objection. Go ahead.
14  A. I had the knowledge of what Chris and Mr.,
15  I think it's Alleo or Azello, however you say his
16  name, and told me --
17  Q. The guy that looks like Isella?
18  A. Isella, is that his name. I had no
19  information besides when I got to the hallway door
20  and they talked to us and told us "hey, this is
21  what's going on." Before that moment I had no

Page 59

1  recollection of anything with Mr. Mills.
2  Q. What did they tell you?
3  A. They had stated --
4  Q. And tell me who told you what?
5  A. Okay. From what I can recall, Coulter and
6  Isella, or however you say his name, Isella, was
7  there. They had stated to me and Officer Shapelow
8  there was some type of incident, there was a dispute
9  over card counting. Mr. Isella had stated that, who
10  I now know as Mr. Mills, had violated some type of
11  card counting ordinance, something to that extent.
12  They said "hey, we're just going to ban this guy, we
13  just want to get his information so we can send him
14  on his way."
15  Q. Who is the one that said there was some
16  type of ordinance violation?
17  A. I believe it was Mr. Isella.
18  Q. You are a police officer, right?
19  MR. CREECH: Objection. Go ahead.
20  A. At this moment, yes.
21  Q. And even then you were an off-duty police

Page 60

1  officer by what you say?
2  A. Yes, I was off duty.
3  Q. Do you guys carry an ordinance book?
4  A. For?
5  Q. I know in Las Vegas, and I know in Allen
6  Park, Michigan, and I know in Dearborn, Michigan
7  police officers carry, usually it's spiral bound, in
8  fact all three of the ones I know of are spiral
9  bound, and they are quick flip notebooks of what the
10  laws are and what the ordinances are in order that
11  they can double-check things. They are not
12  thorough, okay. By that I mean -- do you carry
13  anything with a short form set of laws that you can
14  refer to?
15  A. No.
16  Q. No. So how do you remember traffic
17  violations as a patrol officer when you're writing
18  them?
19  A. We have a traffic law book. That's not an
20  ordinance book though. We have a traffic law book
21  and then a lot of the stuff we have on our computer

Page 61

1  that we can do key word searches and it pulls up the
2  entire book.
3  Q. Crud, I forgot about that whole computer
4  thing now. But you don't have your computer when
5  you're working at Maryland Live, right?
6  A. No.
7  Q. Okay.
8  MR. CREECH: Objection. Go ahead.
9  Q. Do you have your computer out in your car
10  when you're working at Maryland Live?
11  A. Depends on the day, but, yes, generally.
12  Q. So you take a patrol car to Maryland Live
13  to go to work?
14  A. Yes.
15  Q. With a radio in it and computer in it?
16  MR. CREECH: Objection. Go ahead.
17  A. My radio is on me with my uniform, but
18  yes.
19  Q. Okay. Do you have any knowledge of what
20  type of arrangement is made in order that the
21  taxpayers of Anne Arundel County provide you with a



### Page 62

1  vehicle to drive back and forth to a moonlighting
2  job?
3      MR. CREECH: Objection.
4      MS. BEALL: Objection.
5   A. I have no idea.
6   Q. Okay.
7      MR. CREECH: Also to the comment it's a
8  moonlighting job. It's secondary employment
9  here in Anne Arundel County.
10     MR. NERSESIAN: Yeah, that's sort of what
11 moonlighting is, Mr. Creech.
12     MR. CREECH: Well, I disagree -- disagree
13 with the phrasing. But...
14     MR. NERSESIAN: I could say piggybacking
15 on the public dime if you want me to.
16     MR. CREECH: I guess you can say whatever
17 you want to, Mr. Neresian.
18  Q. So who said that we need to get -- "we
19 just want to get his I.D. and get him out of here"?
20  A. I believe it was Mr. Coulter.
21  Q. Okay. So even before you entered the

### Page 63

1  room, Mr. Isella had essentially told you we're not
2  interested in arresting this guy for anything?
3      MR. CREECH: Objection.
4   A. He never said that. He just stated that
5  there was some type of card counting violation. And
6  that's when I believe Chris Coulter said "hey, we
7  just want to get his information so we can ban him."
8   Q. Okay. If there were an ordinance, do you
9  know whose ordinance it would have been?
10     MR. CREECH: Objection.
11     MS. BEALL: Objection.
12     MR. CREECH: Speculation. Go ahead.
13     MR. NERSESIAN: Fine. So he speculated
14 about everything.
15  Q. Go on?
16     MR. CREECH: Objection to the comment.
17     MR. NERSESIAN: I can comment on your
18 comments while you're trying to give speaking
19 objections.
20     MR. CREECH: Objection to the
21 characterization.

### Page 64

1   A. So give me the question?
2   Q. If there --
3      MR. CREECH: Objection. He's trying to
4  respond to the question. Please allow him.
5      MR. NERSESIAN: Can you read back what
6  just happened, because I need him to stop that.
7      (Reporter read back testimony.)
8   Q. So give me the question again. I'm giving
9  him the question again and you're jumping down my
10 throat. I'm following your client's request. The
11 question again is if there were an ordinance that
12 was being violated, do you know whose ordinance it
13 would have been?
14  A. I did not know. I know Mr. Isella, I
15 believe he told me he's with the Gaming Commission,
16 so I assume it was a Gaming Commission ordinance.
17 Or Maryland Lottery, Maryland Gaming Commission, one
18 of those. I'm not really sure what the official
19 title is for the Gaming Commission.
20  Q. Isn't it true that they issue regulations,
21 not ordinances?

### Page 65

1      MR. CREECH: Objection.
2      MS. BEALL: Objection.
3      MR. CREECH: Go ahead.
4   A. I don't know.
5   Q. So you assumed it was a body that you
6  don't even know had authority to make an ordinance
7  that he was referring to as the ordinance maker?
8      MR. CREECH: Objection.
9      MS. BEALL: Objection.
10     MR. CREECH: Go ahead.
11  Q. Fair statement?
12  A. I don't know.
13     MR. CREECH: Objection. Go ahead.
14  A. I don't know.
15  Q. And that's exactly what you followed up on
16 too was walking in there and making sure that
17 Mr. Mills gave up his I.D., right?
18     MR. CREECH: Objection.
19     MS. BEALL: Objection.
20     MR. CREECH: Go ahead.
21  Q. That was your goal, to get his I.D.?

**Page 66**

1  A. Like I said, Mr. Coulter --
2     MR. CREECH: Objection.
3  A. Mr. Coulter had asked we just -- "hey,
4  listen, we just want to get this guys I.D. so we
5  know who he is so we can ban him." So that was
6  objection going into the room was "hey, let's just
7  get his I.D. so we can get him out of here."
8  Q. You said "that was my objection." You
9  meant your objective?
10 A. My objective, correct.
11 Q. Okay. Now, when you entered, Mr. Mills
12 stated he would like to leave, right?
13    MR. CREECH: Objection. Go ahead.
14 A. He never stated to me that he would like
15 to leave.
16 Q. Okay. He did resist providing his
17 identification, fair statement?
18 A. When I first got there, yes.
19 Q. Okay. In fact he told you that there's no
20 law that says I have to, right?
21 A. I don't recall that.

**Page 67**

1  Q. Didn't he tell you that he's back there
2  against his will and there is no law that allows
3  them to do that either?
4     MR. CREECH: Objection.
5     MS. BEALL: Objection.
6  A. He did mention something of that sort.
7  Whether that's the exact phrasing, I'm not sure.
8  Q. Now, here's my question. At one point you
9  go, "well, you aren't in Nevada." Remember that?
10 A. To something to that extent, correct.
11 Q. And you said, "here we have ordinances
12 against that sort of thing", right?
13 A. Yes, based on what I was being told.
14 Q. Well, based on what you were being told by
15 Isella. So you have the gentleman to my right,
16 Mr. Mills, telling you X, and Mr. Isella telling you
17 Y. Mr. Isella has an agenda, he wants an I.D.
18 Mr. Mills has an agenda, he doesn't want to be held
19 and he doesn't want to provide his I.D. Why do you
20 believe Mr. Isella instead of Mr. Mills?
21    MR. CREECH: Objection.

**Page 68**

1     MS. BEALL: Objection.
2     MR. CREECH: Form of the question.
3  A. I don't think Mr. Isella was the one who
4  wanted his I.D., he was the one informing me about
5  the gaming laws they have in place.
6  Q. Well, if they don't have ordinances, does
7  he have to give up his I.D.?
8     MR. CREECH: Objection.
9  A. I don't know if they had ordinances. It
10 would be my assumption that if he identified himself
11 as part of the Gaming Commission that he would
12 understand that.
13 Q. Who is part of the Gaming Commission?
14 A. Mr. Isella.
15 Q. Where do you get that information?
16 A. That's what he told us.
17 Q. Mr. Isella told you he's part of the
18 Gaming Commission?
19 A. Yes, that he worked for Maryland Gaming
20 Lottery Commission, something of that essence.
21 Q. When did he tell you that?

**Page 69**

1  A. In the hallway outside.
2  Q. You had never seen him before?
3  A. I have seen his face there before. I
4  didn't know exactly who he is. I've seen him at the
5  casino before.
6  Q. Okay. Would it surprise you if he's
7  actually employed by Maryland Live?
8     MR. CREECH: Objection.
9     MS. BEALL: Objection.
10 A. I don't know who he's employed by.
11    MR. NERSESIAN: Can we take five.
12    (Off the record colloquy.)
13 BY MR. NERSESIAN:
14 Q. Back where we left. Did Isella tell you
15 he worked for the Gaming Commission?
16 A. No. I guess he was -- partly I was
17 probably just assuming. He didn't officially state,
18 "hi, I'm this person with the Gaming Commission."
19 It was more like, "hey, this is the gaming law
20 regarding this", blah, blah, blah. I know for a
21 fact I have seen him in the Gaming Commission

Page 70

1  office. They have a little Gaming Commission office
2  in Maryland Live, and I have seen him in there on
3  occasions. So I might have assumed that maybe he's
4  with them. I don't know. I don't know.
5      Q. Okay.
6      A. But whether he officially identified
7  himself as here, I'm this person, no.
8      Q. So Isella Vegas told you that this
9  violates ordinances?
10     A. Yes.
11     Q. Card counting?
12     A. Yes.
13     Q. Since then have you looked into that?
14         MR. CREECH: Objection. Go ahead.
15     A. No, I have not.
16     Q. So you don't know even today whether or
17 not Isella lied to you or Mr. Mills lied to you?
18         MR. CREECH: Objection.
19         MS. BEALL: Objection.
20         MR. CREECH: Other than discussions with
21     counsel. Go ahead.

Page 71

1      A. I wouldn't assume anyone lied to me, but I
2  don't know what the ordinance says. Nothing has
3  changed since that day, I haven't looked any further
4  into it.
5      Q. Do you know of an ordinance?
6          MR. CREECH: Objection.
7      Q. Or a regulation or anything that would
8  even touch on that being a crime?
9          MR. CREECH: Objection.
10     A. I don't know. I'm not familiar with
11 whatever he was referring to.
12     Q. What if he was referring to nothing?
13         MR. CREECH: Objection.
14     Q. He made it up?
15         MS. BEALL: Objection.
16     Q. He wants his I.D. These people want his
17 I.D. Why would you assume they are not lying to
18 you?
19         MR. CREECH: Objection.
20         MS. BEALL: Objection.
21         MR. CREECH: Go ahead.

Page 72

1      A. I don't assume anyone is lying to me.
2      Q. Then why didn't you assume that Mr. Mills
3  was being truthful when he told you there is no such
4  ordinance and this is legal. You don't assume
5  everybody is being truthful. So why did you believe
6  Isella?
7          MR. CREECH: Objection. Argumentative.
8          MS. BEALL: Objection.
9      A. I didn't take one side or the other. My
10 objective was to get his identification so he could
11 be properly band and we could resolve everything and
12 everybody would be on their way. That was my only
13 objective.
14     Q. Do you think you have the right or
15 authority to get anybody's I.D. at any time for any
16 or no reason?
17         MR. CREECH: Objection.
18         MS. BEALL: Objection.
19         MR. CREECH: Go ahead.
20     A. I don't know that I have an answer to
21 that.

Page 73

1      Q. Well, I would like one. Do you believe,
2  Douglas Bilter, that I have a right to get anybody's
3  identification at any time for any or no reason?
4      A. No.
5          MR. CREECH: Objection.
6      A. That's not correct.
7      Q. So you don't?
8      A. No.
9      Q. When do you have a right to get I.D. I'm
10 going to withdraw that question and go back a step.
11 In your training you were taught -- or were you not
12 taught when you had authority to request
13 identification?
14         MR. CREECH: Objection. Go ahead.
15     A. Yes.
16     Q. Okay. Do you know what a citizen
17 encounter is?
18         MR. CREECH: Objection.
19     Q. From your training?
20         MR. CREECH: Go ahead.
21     A. A citizen contact is probably what we