# EXHIBIT 4

EXHIBIT 4

# Transcript of

## Christopher Michael Coulter

Date: Monday, February 27, 2017

Phone: 1-866-337-6778
Fax: 410-268-7006
info@corbinreporting.com

www.corbinreporting.com





*- Specializing in Interactive Realtime & Rough ASCII Transcripts -*

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017                 Pages 26–29

Page 26
1 anything like that?
2  A  That is correct.
3  Q  So you could ask him to leave at any
4 time for any or no reason?
5  A  Yes.
6  Q  Okay. And at that point, what do you
7 understand his obligation to be when you ask him to
8 leave?
9     MS. BEALL: Objection.
10  A  Can you restate that one time?
11  Q  Okay. When you asked Mr. Mills to
12 leave, what is his obligation to Maryland Live?
13  A  If I was to ask him to leave, I would
14 expect --
15     MR. CREECH: Objection. Go ahead.
16     MS. BEALL: Objection.
17  A  I would expect him to leave.
18  Q  Okay. And do you understand that that
19 is also enforceable?
20  A  Yes.
21  Q  And that would be through either a

Page 27
1 citizen's arrest for trespass or summoning the
2 police for a trespasser, correct?
3     MR. CREECH: Objection.
4     MS. BEALL: Objection.
5  A  Yes.
6  Q  Okay. So when you approached Mr.
7 Mills -- strike that.
8     You said you saw him the first time
9 where?
10  A  At -- I believe it was at the pit, but
11 without looking at the report again, I couldn't
12 tell you.
13  Q  Or the video?
14  A  Or the video. Either one. Well, the
15 video only shows --
16  Q  Well, here's the report. You want your
17 report or the incident file --
18  A  My report.
19  Q  -- report?
20     Okay. Go ahead and use it to refresh
21 your recollection.

Page 28
1     (Mr. Mills enters the room.)
2  Q  Got to find it first.
3     (Discussion held off the record.)
4  Q  Feel free to review it and refresh your
5 recollection. That would be correct, is that your
6 initial report -- or is that your report?
7  A  This is my report.
8  Q  Okay.
9     (Exhibit Number 1 is marked.)
10  Q  Now, when did you first see Mr. Mills?
11  A  Coming -- going into the restroom and
12 then coming back out.
13  Q  So you didn't watch him play at all?
14  A  No.
15  Q  Okay. And you didn't see him in the pit
16 then?
17  A  No.
18  Q  That's what I call a very bad question.
19 My problem. You didn't see him in the pit gets a
20 "no"; that what's called a double negative, and we
21 have no answer. So let me ask again.

Page 29
1     Did you see him in the pit?
2  A  No.
3  Q  Okay. So it's safe to say that up to
4 this point you and Mr. Mills are strangers?
5  A  That is correct.
6  Q  Do you know who Jason Yeager is?
7  A  No.
8  Q  Now, let's go to exactly what
9 surveillance asked you to do. They asked you to
10 eject Mr. Mills?
11  A  Evict.
12  Q  Evict. Okay. What does evict Mr. Mills
13 mean?
14  A  It means that the casino no longer wants
15 him on the property and they don't want him on the
16 property for a set amount of time. That is
17 determined by a minimum of 30 days. And then the
18 board meets, and they decide how much longer that's
19 going to be.
20  Q  Okay. And you can do that verbally,
21 right?



CORBIN
REPORTING & VIDEO

410-268-6006
1-866-337-6778

Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 4 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017    Pages 30–33

Page 30

1        MS. BEALL: Objection.
2    A   No. They ask us to do that in writing.
3    Q   They ask you to try to do it in writing.
4   Is that a more correct statement?
5        MR. CREECH: Objection.
6        MS. BEALL: Objection.
7    A   No, they want us to do it in writing.
8    Q   Okay. So they require that you get this
9   procedure done in writing.
10   A   Yeah. We read the form and have them
11  sign it as acknowledgment.
12   Q   What if they refuse to sign?
13   A   Then I put down it's refused to sign,
14  and we send the individual on his way.
15   Q   What if they refuse to even let you know
16  who they are?
17   A   Then we try to find out who they are by
18  asking them to provide their ID.
19   Q   Do you take them into custody to ask
20  them for ID?
21       MS. BEALL: Objection.

Page 31

1    A   We don't take them into custody. We
2   take them back into the holding room.
3    Q   Do you know what -- you're a police --
4   you were a police officer for years. Do you know
5   what custody is?
6        MR. CREECH: Objection.
7        MS. BEALL: Objection.
8    A   I do.
9    Q   Okay. If somebody is told you can't
10  leave, would you -- by people in authority with
11  guns, would you agree that they are in custody?
12       MR. CREECH: Objection.
13       MS. BEALL: Objection.
14   A   With guns. Yes.
15   Q   Okay. What if they are surrounded by a
16  show of force with hands on and directed to a
17  certain place against their will, would you agree
18  that they are in custody?
19       MR. CREECH: Objection.
20       MS. BEALL: Objection.
21   A   One more time with the question.

Page 32

1        MR. NERSESIAN: Could you read it back,
2   please?
3        (The question is read by the reporter.)
4    Q   Long pause.
5    A   Yes.
6    Q   Okay. Mr. Mills was in custody in that
7   hallway, would you agree?
8    A   No.
9        MS. BEALL: Objection.
10   Q   What part of the last question was
11  missing?
12       MR. CREECH: Objection.
13       MS. BEALL: Objection.
14   Q   He was surrounded with a show of force,
15  correct?
16       MR. CREECH: Objection.
17       MS. BEALL: Objection.
18   Q   Refer back to the video you've watched
19  numerous times.
20   A   Right. Was it a show of force? No.
21   Q   Oh, so three security guards, one of

Page 33

1   them reaching out at him -- three security
2   personnel, one of them reaching out at him, is not
3   a show of force in your opinion?
4        MR. CREECH: Objection.
5        MS. BEALL: Objection.
6    A   No.
7    Q   Okay. I did the double negative again,
8   so let me re-ask the question.
9        Are three people surrounding Mr. Mills
10  with one reaching out towards him a show of force
11  in your opinion?
12       MR. CREECH: Objection.
13       MS. BEALL: Objection.
14   A   No.
15   Q   Okay. You went hands-on with Mr. Mills;
16  fair statement?
17       MR. CREECH: Object.
18       MS. BEALL: Objection.
19   A   I'm sorry?
20   Q   You went hands-on with Mr. Mills, fair
21  statement?



Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 5 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017    Pages 34-37

Page 34

1    MR. CREECH: Objection.
2    MS. BEALL: Objection.
3    A    No, I was trying to guide Mr. Mills to
4    the holding area.
5    Q    You didn't grab his wrist?
6    A    I grabbed his wrist, but I was trying to
7    guide him to the holding area.
8    Q    You grabbed his wrist. Again, in your
9    opinion, that is not a show of force?
10   MR. CREECH: Objection.
11   MS. BEALL: Objection.
12   A    No.
13   Q    What did you have to do, shoot him
14   through the head?
15   MR. CREECH: Objection.
16   MS. BEALL: Objection. Don't answer
17   that question.
18   Q    No, I want you to answer the question
19   this way, then: At what point between grabbing
20   someone by the wrist and doing other things does it
21   become a show of force?

Page 35

1    MS. BEALL: Objection.
2    MR. CREECH: Objection.
3    Q    That doesn't mean you don't answer.
4    A    I get that.
5         I still do not believe it was a show of
6    force.
7    Q    Well, then answer the question. What,
8    beyond grabbing somebody by the wrist, is required
9    before it becomes a show of force?
10   MR. CREECH: Objection.
11   MS. BEALL: Objection.
12   A    I would say when we have to wrestle
13   someone to the ground and handcuff them.
14   Q    Ah, okay. You said you were trained in
15   verbal judo?
16   A    Mm-hmm.
17   Q    Is that a yes?
18   A    Yes. Sorry. I had a drink of water.
19   Yes, it is. I apologize.
20   Q    And verbal judo is a course or process
21   often taught to police officers and security

Page 36

1    officers for the very purpose of avoiding physical
2    confrontation or physical contact in a situation
3    involving somebody confronted by you; fair
4    statement?
5    MR. CREECH: Objection.
6    MS. BEALL: Objection.
7    A    It's a thing that we're taught to
8    de-escalate the situations.
9    Q    To de-escalate? I thought it was
10   something that was taught -- okay, yeah. It can
11   de-escalate, but it can also gain compliance. Is
12   that also part of it?
13   MR. CREECH: Objection.
14   MS. BEALL: Objection.
15   Q    Okay. With respect to the verbal judo,
16   if you had to grab Mr. Mills -- if you felt or
17   reached a point where you grabbed Mr. Mills' wrist,
18   your verbal judo failed; is that a fair statement.
19   MR. CREECH: Objection.
20   MS. BEALL: Objection.
21   A    That's correct.

Page 37

1    Q    Why did it fail?
2    MR. CREECH: Objection.
3    MS. BEALL: Objection.
4    A    Mr. Mills didn't want to go with us to
5    the room, so, at that point, it failed.
6    Q    You could not gain compliance with
7    verbal judo of Mr. Mills; is that the same thing?
8    A    Yes.
9    Q    Do you think he had to go to that room
10   with you?
11   MS. BEALL: Objection.
12   MR. CREECH: Objection.
13   A    We -- that's how we were instructed.
14   Q    Who instructed you to do that?
15   A    That is the policy at the time at the
16   casino.
17   Q    Tell me what that policy says.
18   A    The policy says if we were evicting
19   people, we were to take them back into the holding
20   hallway, holding room area, and read them the
21   eviction letter so that we don't embarrass them in

Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 6 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017
Pages 38-41

Page 38
1  front of the floor.
2  Q   Was there nothing in the policy about
3  refusal or resistance or stating "I don't want to
4  go back there"?
5  A   Not to my recollection.
6  Q   So regardless of the customer's intent
7  or desires, it was the policy of Maryland Live that
8  people being evicted would be taken to that
9  hallway?
10 A   That is correct.
11     MS. BEALL:  Objection.
12 Q   You said you raised three kids?
13 A   I did.
14 Q   Okay.  Did you ever use the word
15 "stranger danger" with them?
16     MS. BEALL:  Objection.
17     MR. CREECH:  Objection.
18 A   Yes.
19 Q   And that's because strangers are people
20 they're supposed to avoid, right?
21 A   That is correct.

Page 39
1      MS. BEALL:  Objection.
2  Q   Also, did you ever give your children
3  instructions about what they should do or what the
4  proper course is if a stranger tries to touch you?
5      MS. BEALL:  Objection.
6  A   Yes.
7  Q   And what was the instructions that you
8  gave?
9      MS. BEALL:  Objection.
10 A   If someone was trying to approach them
11 or someone tried to get them, to scream, yell, try
12 to get someone's attention, try to get help.
13 Q   Mr. Mills ever say "help"?
14 A   Not that I remember.
15 Q   And nothing's changed now that your kids
16 are adults, you would expect them to still have the
17 same type of reaction overall, right?
18     MS. BEALL:  Objection.
19 A   I would hope they would.
20 Q   Yeah.  Let's go back to what I asked a
21 few minutes ago.  You guys are strangers.  Why is

Page 40
1  he supposed to do anything you're telling him to
2  do?
3      MS. BEALL:  Objection.
4      MR. CREECH:  Objection.
5  Q   In fact, by your own training of your
6  own children and your current expectations today,
7  Mr. Mills should not have accompanied you; fair
8  statement?
9      MS. BEALL:  Objection.
10     MR. CREECH:  Objection.
11 A   No.
12 Q   Why not?
13 A   Mr. Mills -- I identified myself to Mr.
14 Mills and who I was.
15 Q   Why should he believe you?
16     MS. BEALL:  Objection.
17     MR. CREECH:  Objection.
18 Q   Strangers lie, don't they?
19     MR. CREECH:  Objection.
20 A   They do, but they also don't carry
21 Maryland Lottery badges on them.

Page 41
1  Q   Did you show him your badge?
2  A   It's on me; it was in plain sight.
3  Q   Okay.  Want to see my pretty little
4  silver badge that says I'm a lone ranger?  People
5  can have badges, right?  Okay.  True?
6      MS. BEALL:  Objection.
7  A   It's true.
8  Q   Yeah.  You ought to start carrying a
9  lone ranger badge.  All right.
10     What good can come out of him following
11 you?
12     MS. BEALL:  Objection.
13 A   Just so he doesn't get embarrassed on
14 the floor, after reading him all that there.
15 Eviction letter, excuse me.
16 Q   I think it was in yours that -- what is
17 stop one or -- wait a minute.
18 A   I have no idea.
19 Q   Can -- may I, for a second?
20 A   Yeah, yeah.
21 Q   Post one?



Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 7 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017                Pages 42–45

Page 42

1  A  Post one.
2  Q  Okay.
3  A  Post one? I don't know of any post one.
4  I know post 10.
5  Q  Well, you're the guy who actually sat at
6  a keyboard and entered the information on Coulter
7  1, correct?
8  A  I don't recall what post one is. I
9  mean, I really don't.
10  Q  Okay. What about the other question?
11  A  What?
12  Q  You're the one who sat at a keyboard --
13     MR. CREECH: Objection. What other --
14  Q  That other question. You're the one at
15  the keyboard who actually put in the information
16  that ended up on Coulter 1?
17  A  That is correct.
18  Q  Do you recall Mr. Mills attempting to
19  continue walking away from you when one of your
20  agents or one of the -- another Maryland Live
21  employee put out his arm and stopped him?

Page 43

1  A  Do I remember that?
2  Q  Yes.
3  A  Yes.
4  Q  And that did happen?
5  A  Yes.
6  Q  Why couldn't Mr. Mills go where he
7  wanted to?
8  A  We were following the procedure at the
9  time, which is we had -- we needed to take him to
10  the back room.
11  Q  Is that the procedure today?
12     MS. BEALL: Objection.
13  A  I have no idea. It's changed in two and
14  a half years.
15  Q  All right. Was that the procedure --
16  strike that.
17     Did you have any questions posed to you
18  at any time by Anne Arundel police or the district
19  attorney about this incident? Were you ever
20  interviewed?
21  A  Before or after?

Page 44

1  Q  After.
2  A  I was interviewed after, when the first
3  charges came for the -- I forget what it is. But,
4  yeah, the first time. That was the only time I've
5  ever talked to anyone.
6  Q  Right.
7  A  But never the police.
8  Q  Who was that?
9  A  It was my attorney.
10  Q  Your attorney related to this
11  litigation?
12  A  Yeah, the first one, the first time,
13  when the charges were filed with Anne Arundel
14  County. I couldn't tell you.
15  Q  Okay. Were you still working at
16  Maryland Live at that point?
17  A  Yes.
18  Q  At that point in time, had the policies
19  at Maryland Live changed?
20     MS. BEALL: Objection.
21     MR. CREECH: Objection.

Page 45

1  A  I don't remember if they have or not.
2  Q  Okay. Do you know if the policies at
3  Maryland -- at any time while you were working
4  there, did the policies at Maryland Live say unless
5  there is a crime committed, nobody is to be taken
6  to the back room?
7  A  I -- I couldn't tell you.
8  Q  What do you remember about changing
9  policy while you were there relative to persons in
10  Mr. Mills' situation?
11  A  As such?
12  Q  Do you recall -- do you recall what --
13  strike that.
14     You testified as to your policy at the
15  time of this -- as of February 20th, 2014, right?
16     MS. BEALL: Objection.
17  A  Yes.
18  Q  And that is the policy regarding
19  eviction?
20  A  Correct.
21  Q  And that policy regarding eviction is

Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 8 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017    Pages 46–49

Page 46

1  they are taken to the back room?
2   A   That is correct.
3   Q   At any time while you were with Maryland
4  Live did that policy change?
5   A   I have no idea.
6   Q   No recollection or no idea?
7   A   No recollection.
8   Q   Okay. You would have to have an idea;
9  you were the guy enforcing the policy, right?
10  A   Yes.
11     MS. BEALL: Objection.
12     MR. CREECH: Objection.
13  Q   Did you ever become familiar with that
14 policy changing at any time?
15  A   At some point it did change.
16  Q   To what?
17  A   To where if we wanted to, we could go to
18 post 10, or on the spot read, as long as it wasn't
19 anything overly serious that required us to remove
20 someone from the floor, fights, things like that.
21  Q   Breaches of the peace?

Page 47

1   A   Yes.
2   Q   Okay. So at that point, it was read
3  them at the floor, right, or on the floor?
4   A   After the incident?
5   Q   Yeah. I'm talking about the changed
6  policy.
7   A   Oh, yes.
8   Q   That's the point I'm referring to.
9   A   Yes, at that point it did change.
10  Q   Okay. Were you in any way instrumental
11 in seeing that policy changed? Were you involved
12 in seeing that policy changed?
13  A   No, I didn't make policy there for the
14 security department.
15  Q   Do you know if that change came in
16 response to Mr. Mills' original charges or anything
17 to do with the Mills occurrence?
18  A   I have no idea.
19     MS. BEALL: Objection.
20     MR. CREECH: Objection.
21  Q   Where would one have found that policy?

Page 48

1   A   It would have been in the SOP, standard
2  operating procedures, if that's what they're
3  called.
4   Q   Were those written?
5   A   Yes.
6   Q   So somewhere there's a written policy
7  that says anybody who is to be evicted is to be
8  taken into the back hallway?
9   A   At that time there should have been,
10 yes.
11  Q   Okay. In your training to be an MP, did
12 you study false imprisonment?
13  A   Yes.
14  Q   Okay. Now, you understand Maryland Live
15 is a private entity, correct?
16  A   That is correct.
17  Q   They don't make laws?
18  A   That is correct.
19  Q   Okay. What is your understanding of
20 what constitutes false imprisonment?
21  A   Being confined to a cell against their

Page 49

1  will.
2   Q   It has to be a cell or just confined or
3  taken into custody against their will?
4   A   Confined to a room, an area.
5   Q   Okay. Against their will, right?
6   A   Yes.
7   Q   And without consent, Mr. Mills did not
8  consent to go to that back room. Is that a fair
9  statement?
10     MS. BEALL: Objection.
11  A   Yes.
12  Q   In fact, he protested, true?
13  A   Yes.
14  Q   As you understood it, what was the legal
15 authority for Maryland Live to make somebody go to
16 their back room --
17     MS. BEALL: Objection.
18  Q   -- for an eviction? Under what legal
19 authority could they take them there?
20     MS. BEALL: Objection.
21     MR. CREECH: Objection.

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017      Pages 50–53

Page 50

1  Q   If you know?
2  A   I don't know.
3  Q   So did you -- do you recognize that
4  there has to be legal authority to take someone
5  into custody, else it is false imprisonment?
6      MS. BEALL: Objection.
7  Q   Absent legal authority, taking someone
8  into custody is false imprisonment; would that be
9  your understanding?
10     MS. BEALL: Objection.
11 A   Yes.
12 Q   Okay. While you were doing this to Mr.
13 Mills, did you ever once question whether or not
14 you were -- what you were doing was legal?
15 A   No.
16     MS. BEALL: Objection.
17 Q   Have you since?
18 A   No.
19     MS. BEALL: Objection.
20     MR. CREECH: Objection.
21 Q   So today, with the same instructions

Page 51

1  from an employer that were a standard operating
2  procedure as to an eviction, if it read the
3  identical way it does today, you would do exactly
4  what you did here?
5  A   That is correct.
6      MS. BEALL: Objection.
7  Q   What if it was -- strike that.
8      Did you learn at some point a
9  surreptitious police move known as an angle drop?
10     MS. BEALL: Objection.
11     MR. CREECH: Objection.
12 A   I've never heard of that.
13 Q   Where, if somebody's resisting and you
14 happen to fall on them the correct way, you can be
15 guaranteed to break their ankle?
16 A   No.
17 Q   Oh, okay.
18     MR. CREECH: Objection.
19 Q   Please don't learn it.
20     When you were in the military, what was
21 the rule regarding unlawful orders?

Page 52

1  A   If the -- this is going back. I can't
2  give you a good read without the UCMJ sitting in
3  front of me.
4  Q   It was a real tough one even then,
5  wasn't it?
6  A   It was. But, God, it was so long ago.
7  Q   Don't you actually -- isn't the rule in
8  the military that you have to look at it, and it
9  falls on the individual who gets the order, and if
10 it truly is an unlawful order, they are supposed to
11 refuse to follow it and take the consequences and
12 stand on their understanding of the law?
13     MS. BEALL: Objection.
14 A   That's pretty much close to it, yes.
15 Q   Yeah, okay. Would you have more or less
16 authority to refuse an unlawful order of a private
17 employer or the military?
18     MS. BEALL: Objection.
19     MR. CREECH: Objection.
20 Q   It's easier to say no to a private
21 employer than it is to a colonel, isn't it?

Page 53

1      MS. BEALL: Objection.
2      MR. CREECH: Objection.
3  A   No, not really.
4  Q   No? One subjects you to the brig, the
5  other subjects you to getting another -- a
6  different job. You don't think that one is more
7  onerous than the other?
8      MS. BEALL: Objection.
9      MR. CREECH: Objection.
10 A   No.
11 Q   Oh, okay. Did I use the right term for
12 the Air Force, brig?
13 A   I knew what you were talking about, so
14 yes, that was fine.
15 Q   Okay. Since we came in here, I have --
16 can we go off?
17     (Discussion held off the record.)
18     (A recess is taken.)
19 BY MR. NERSESIAN:
20 Q   This policy that's written down
21 somewhere that everybody has to go through the back

Case 1:15-cv-00495-RDB   Document 136-5   Filed 05/11/17   Page 10 of 13

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017          Pages 54–57

Page 54

1  hallway, what else is part of that policy?
2       MS. BEALL: Objection.
3   A   Without sitting in front of me, I
4  couldn't tell you. I mean, I could tell you some
5  basic things. Checking IDs --
6   Q   And what would happen if somebody
7  refused to provide ID?
8       MR. CREECH: Objection.
9       MS. BEALL: Objection.
10  A   Well, it would depend upon what
11  situation we're talking about. If they're trying
12  to come through the entrance and they don't want to
13  provide us their ID, then they're turned away.
14  Q   Right.
15  A   If they're asked for ID on the floor
16  because someone thinks they're too young or they're
17  not sure what their status is, then we'll ask
18  people to produce IDs on the floor.
19  Q   And if they don't, you'll ask them to
20  leave, right?
21  A   Yes.

Page 55

1   Q   What's different about Mr. Mills?
2   A   Mr. Mills was being served --
3       MS. BEALL: Objection.
4   A   -- an eviction letter. Sorry.
5   Q   What do you need to serve an eviction
6  letter?
7   A   I need an ID so we can put down the
8  right address, make sure that his certified letter
9  that he gets sent saying what the final status is,
10  he gets.
11  Q   That's for the casino's convenience,
12  right?
13      MS. BEALL: Objection.
14      MR. CREECH: Objection.
15  A   I would assume so, but I can't tell you
16  for sure.
17  Q   So, do you think you can compel somebody
18  to produce identification under the law?
19      MS. BEALL: Objection.
20      MR. CREECH: Objection.
21  Q   Do you think that? Think about it this

Page 56

1  way. The court reporter to your left looks at you
2  and says, let me see your driver's license, do you
3  have to give it to her?
4       MS. BEALL: Objection.
5       MR. CREECH: Objection.
6   A   We're not in a casino, so no.
7   Q   Why in a casino?
8   A   Because there are age restrictions --
9   Q   You weren't checking his age, were you?
10      MS. BEALL: Objection.
11      MR. CREECH: Objection.
12  A   No.
13  Q   Okay. Why does -- why would he have to
14  give you his ID?
15  A   It's part of the process we -- we have
16  to get an address from him.
17  Q   And if you already have an address, it
18  wouldn't matter, would it?
19      MS. BEALL: Objection.
20  A   We'd still have to verify it.
21  Q   Why?

Page 57

1   A   Because I don't know that we had an
2  address for him.
3   Q   Did you ask him, have we got your
4  address?
5   A   Not that I remember, no.
6   Q   No. Instead, you called two cops in to
7  loom over him and get his driver's license, right?
8       MR. CREECH: Objection.
9       MS. BEALL: Objection.
10  A   I asked two officers to help me, yes.
11  Q   Okay. For the sole purpose of getting
12  his identification?
13  A   That is correct.
14  Q   Okay. So let's go back to this call
15  down from surveillance. They used -- they called
16  him by name, right?
17  A   No.
18  Q   No?
19  A   My call was there was a advantage player
20  at pit seven, which I believe I think is the high
21  limits, but I can't say for sure, it's been so

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017                     Pages 58-61

Page 58

1  long.  And they just gave me a basic description.
2  They told me that he just -- we saw him go in the
3  bathroom and we came out.
4      Q    Actually, you followed him into the
5  bathroom, didn't you?
6      A    Right.  They gave me kind of a
7  description of him, and I assumed that was him.
8  And when he came out, they told me.
9      Q    So you had a radio on?
10     A    (Nods head.)
11          MS. BEALL:  Make sure you respond
12  verbally.
13     A    Oh, yes, I had a radio on.
14     Q    Was this a wire --
15     A    It's an earpiece.
16     Q    And surveillance can hear what you're
17  saying, too, right?
18     A    I don't know what their capabilities of.
19  I've never been in the surveillance room.  They
20  have -- our radios have several different
21  frequencies, and each service has their own

Page 59

1  frequency that they transmit on.  But I don't know
2  if surveillance has the capability to monitor it or
3  not.
4      Q    Is yours constant on or do you have to
5  push a button?
6      A    Mine is always on.
7      Q    Okay.
8      A    To listen, to transmit, I need to push a
9  button.
10     Q    Well, this is the full incident file
11  report.
12     A    That's surveillance's only.
13     Q    Oh, it's not --
14     A    This is -- that's this one here.
15     Q    That's yours, this is surveillance's.
16          Well, surveillance says -- let me --
17  hold on a second.  MLGCA hallway.  Do you know what
18  MLGCA stands for?
19     A    Maryland Lottery Gaming Commission, I
20  can't tell you anything else.
21     Q    Accessway?

Page 60

1      A    Yeah, we just call it the hallway.  We
2  called it MSLA hallway.
3      Q    Could it be Maryland Live Gaming
4  Commission Access Hallway?  And if the gaming
5  commission comes on site, that's where they want to
6  talk to people?
7          MR. CREECH:  Objection.
8          MS. BEALL:  Objection.
9      A    Maryland Live Lottery, our gaming
10  commission has an office in the casino itself, in
11  that hallway.
12     Q    In that hallway?
13     A    Right.  At the end of the hallway.
14     Q    So that hallway takes you to the
15  commission?
16     A    That is right, and to the doctor too.
17     Q    Is there also a security holding room?
18     A    There is one.
19     Q    Now, you've taken Mr. Mills back there
20  to interrogate him about his identification; fair
21  statement?

Page 61

1          MS. BEALL:  Objection.
2          MR. CREECH:  Objection.
3      A    I was asking him for his ID, yes.
4      Q    And he was refusing to provide it?
5      A    Yes.
6      Q    Okay.  Could you have taken him to the
7  other holding room to do that?
8          MR. CREECH:  Objection.
9          MS. BEALL:  Objection.
10     A    You're talking about the small holding
11  room?
12     Q    Where else would you take somebody to --
13  for investigation or interviewing?
14     A    It would be in that hallway or in the
15  confinement room.  I don't want to use confinement.
16  The holding room.
17     Q    Yes.  Okay.  What is it called, the
18  confinement room or the holding room?
19     A    It's the holding room.
20     Q    Is there audio in the holding room?
21     A    Yes, there is.

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Christopher Michael Coulter taken February 27, 2017                           Pages 118–121

Page 118
1  Q   Yes or no?
2  A   I'm sorry, yes.
3  Q   All right. And as you said, this was
4  policy and protocol, so everything they were seeing
5  was normal to them, too?
6  A   That is correct.
7      MS. BEALL: Objection.
8      MR. CREECH: Objection.
9  Q   Is there a security manager at Maryland
10 Live Casino?
11 A   Well, there are three, one works days,
12 swings, and mids.
13 Q   And you're one of the security managers?
14 A   That's right.
15 Q   Okay. Did everything you did that night
16 related to the Mills occurrence occur within the
17 course and scope of your employment with Maryland
18 Live?
19     MS. BEALL: Objection.
20 A   Yes.
21 Q   Did Mr. Mills touch you before you

Page 119
1  grabbed him?
2  A   Not that I recall.
3  Q   Now, when you watched the YouTube video,
4  did you see -- and I'm talking about the part where
5  there is audio.
6  A   Oh, in the hallway?
7  Q   Yes.
8  A   Okay.
9  Q   On that video, did you see anything that
10 varies with that which actually occurred or --
11     MR. CREECH: Objection.
12 Q   -- varies from that which actually
13 occurred?
14     MR. CREECH: Objection to form.
15     MS. BEALL: Objection.
16 A   No, nothing. Nothing was varied as far
17 as I can see, remember.
18 Q   Okay. And as to what was said in that
19 room while you were there, during that video that
20 is on YouTube with the audio, did there appear to
21 be any audio that was missing or any audio that was

Page 120
1  added?
2      MR. CREECH: Objection.
3      MS. BEALL: Objection.
4  A   There seems to be a quiet spell in there
5  where there doesn't seem to be any audio. But the
6  rest of it seems to fairly portray what happened.
7  Q   Nobody's talking at the time when that's
8  happening, is there?
9  A   I can't tell.
10 Q   Okay. Everything on there that you can
11 hear said was said?
12 A   Yes.
13 Q   Okay. Did Mr. Mills raise his voice out
14 on the floor?
15 A   I can't remember.
16 Q   So you have no recollection of Mr. Mills
17 yelling at anybody?
18 A   I just can't remember.
19 Q   Okay. It looks like earlier this month
20 you signed answers to interrogatories. Do you
21 recall that?

Page 121
1  A   Yes. Earlier this month? Yeah.
2  Q   And has your memory deteriorated since
3  then?
4      MR. CREECH: Objection.
5  A   I --
6      MS. BEALL: Objection.
7  A   I am old, so I don't know.
8  Q   You're not that old.
9  A   I'll be 56 this year, so.
10 Q   Thank you if you think that's old. No,
11 curse you if you think that's old.
12     Do you recall anything said between Mr.
13 Isella and Mr. Mills --
14 A   No.
15 Q   -- on the floor? No?
16 A   No, I do not recall any -- I don't
17 remember anything being said.
18 Q   All right. These are your answers to
19 interrogatories. You've signed and sworn to these.
20 And it says here: Defendant recalls plaintiff
21 raising his voice to Mr. Isella at this time in a

CORBIN
REPORTING & VIDEO
                                                    410-268-6006
                                                    1-866-337-6778

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017                Pages 142–145

Page 142

1  A.  I have nothing further than discussions
2  with counsel. I can't advise you of anything else.
3     MR. NERSESIAN: Wow, you better go look up
4  Champerties and maintenance.
5     MR. CREECH: Wow, you better go --
6     MR. NERSESIAN: Fine.
7  Q.  So you thought at the time Isella worked
8  for the Commission, right?
9  A.  I assumed that, yes.
10 Q.  And you assumed you were being recorded?
11 A.  By video?
12    MR. CREECH: Objection.
13 Q.  Yeah.
14 A.  Yes, I assumed that. Considering there is
15 video almost everywhere in that casino.
16 Q.  And you're a police officer with the Anne
17 Arundel courts -- or Anne Arundel County working as
18 secondary employment as a security officer at
19 Maryland Live?
20 A.  Correct.
21 Q.  And also present is Coulter, the security

Page 143

1  manager at Maryland Live?
2  A.  Yes, I believe he's the security manager.
3  Q.  So as you understood it, while you were
4  talking at Mr. Mills, there was a private
5  individual, Mr. Mills, a Gaming Commission person,
6  you, and a full-time employee of Maryland Live
7  present. Did you think you were having a private
8  conversation -- and it was all being filmed. Did
9  you think you were having a private conversation
10 with Mr. Mills?
11    MR. CREECH: Objection.
12    MS. BEALL: Objection.
13 A.  Of course I did. We were in a secured
14 back hallway area, we weren't out on the public
15 floor.
16 Q.  Yeah. And he was taken there, wasn't it?
17    MR. CREECH: Objection.
18    MS. BEALL: Objection.
19 A.  Again, I don't know how he got there
20 except for when I got there.
21 Q.  No, you do, you saw the video?

Page 144

1  A.  Yes.
2  Q.  You watched it months ago too, didn't you?
3     MR. CREECH: Objection. Asked and
4  answered.
5  A.  I'm saying at the time of this incident I
6  didn't know any of this.
7  Q.  And at the time of the incident he didn't
8  know there wasn't audio recording going on as there
9  normally is, did he?
10    MR. CREECH: Objection.
11    MS. BEALL: Objection.
12 Q.  Did he?
13 A.  You're asking --
14    MR. CREECH: Objection as to normal.
15 A.  You're asking if I knew he --
16 Q.  Seeing as one, their security policy said
17 it should be undertaken --
18    MS. BEALL: Just so you know, the security
19 policy is about a different -- it's a room, a
20 holding room, it's not the hallway.
21    MR. NERSESIAN: Yeah. Except do you know

Page 145

1  what MGC -- MLGCA is. That's the name of your
2  hallway, go look it up.
3     MS. BEALL: I'm telling you -- well, you
4  can ask. But that's what they will testify to.
5     MR. NERSESIAN: Here's the other thing.
6  There is a policy that says that he should --
7  it should be audio recorded. It is normal when
8  he's taken to a back room, all over the country
9  and all the over the world that it is recorded.
10    MR. CREECH: Can this be done outside the
11 presence of the witness.
12    MR. NERSESIAN: No, I'm talking to her for
13 a moment.
14    MR. CREECH: I understand. But I don't
15 want it in front of the witness because you're
16 asking him about the audio recording and saying
17 that it should have been audio recorded, and
18 he's already said he didn't know that.
19    MR. NERSESIAN: I understand he didn't
20 know that. But she's saying that that's the
21 place.