# EXHIBIT 10

# EXHIBIT 10

# Transcript of

## Kyle Shapelow

Date: Friday, February 24, 2017

Phone: 1-866-337-6778
Fax: 410-268-7006
info@corbinreporting.com
www.corbinreporting.com





*- Specializing in Interactive Realtime & Rough ASCII Transcripts -*

Page 22

1  Q. Safe to say you are entirely unfamiliar
2  with the security manual for Maryland Live?
3     MR. CREECH: Objection. Asked and
4  answered. Go ahead.
5  A. I've never seen it.
6  Q. Okay. Were you present when the call
7  for -- strike that. How did you become involved in
8  accompanying -- how did you become involved in the
9  Mills occurrence?
10 A. We were notified by some member of
11 security.
12 Q. Don't know who?
13 A. I do not know who. To respond to the back
14 hall area. And that's where we went.
15 Q. Okay. And then what happened?
16 A. We were informed by some member of the
17 casino, or the casino staff, that they had a subject
18 who had -- they were accusing of card counting, and
19 that it was in violation of some type of ordinance.
20 Q. They really said that?
21 A. As far as I can recall --

Page 23

1     MR. CREECH: Objection.
2  Q. Honest to goodness.
3     MR. CREECH: You stopped him. He was
4  answering the question and you cut him off.
5     MR. NERSESIAN: All right. Fine.
6  Q. Go on, I'm sorry.
7  A. That it was -- in violation of some type
8  of ordinance or whatever the case may be. I don't
9  know the exact words that were used. And they
10 needed to I.D. him so that they could formally do an
11 eviction or a banning with notice.
12 Q. When we were talking earlier, or doing
13 Mr. Bilter's, were you surprised that they already
14 knew who he was?
15    MR. CREECH: Objection if he was
16 surprised.
17    MS. BEALL: Objection.
18 Q. Were you surprised that they already
19 had --
20    MR. CREECH: There's an objection to the
21 question. Could you let him answer the

Page 24

1  question or redo it again.
2  Q. Were you surprised they knew who he was?
3     MR. CREECH: Objection.
4     MS. BEALL: Objection.
5  A. Yes.
6  Q. Okay. Can you think of any reason you
7  were needed to be back there if they already knew
8  who he was?
9     MR. CREECH: Objection.
10    MS. BEALL: Objection.
11 A. To identify him.
12 Q. Well, if they already knew -- they had
13 identified him, right?
14    MR. CREECH: Objection.
15    MS. BEALL: Objection.
16 Q. So what -- can you think of any reason --
17 the only reason you can think of is to identify him,
18 is that a fair statement?
19    MR. CREECH: Objection.
20    MS. BEALL: Objection.
21 A. Or to verify identity.

Page 25

1  Q. Well, did they tell you "we think he's
2  Justin Mills"?
3  A. Not that I remember.
4  Q. Or Lawrence Mills?
5  A. Not that I recall.
6  Q. But they did tell you that he was
7  violating some sort of ordinance, right?
8  A. Yes.
9  Q. Okay. Did you believe them?
10    MR. CREECH: Objection. Go ahead.
11 Q. Do you believe them, under oath?
12    MR. CREECH: Objection again.
13    MS. BEALL: Objection.
14    MR. NERSESIAN: Why -- all right.
15    MR. CREECH: You keep restating --
16    MR. NERSESIAN: You keep interrupting me
17 with stupid low life objections that don't have
18 any basis in fact. The objection you are
19 allowed to make is objection, form. That's not
20 what you're saying.
21    MR. CREECH: I object.

Page 26

1   MR. NERSESIAN: All the others are
2   preserved. So there was nothing wrong with the
3   form of that question and you did not object to
4   form. In fact every time you've just said
5   objection, it is completely useless because you
6   haven't used the word form. There's case law
7   on that. So all you're doing is interrupting
8   the train of thought and the questioning and I
9   would ask you to please stop.
10      MR. CREECH: First of all, I will protect
11  the record, I will make objections that are
12  appropriate. When you ask him, did you believe
13  that, that is an inappropriate question.
14  Whether or not he believed it is irrelevant at
15  that point in time. He told you what he had
16  learned and he was going on that. Now, I will
17  make an objection as I see fit. You ask the
18  questions as you see fit. If you have to reask
19  them, I understand. I guess we will just
20  continue.
21  Q.  Did you believe him?

Page 27

1       MR. CREECH: Objection. Go ahead.
2   A.  I had no reason not to at that time.
3   Q.  Did you hear Mr. Mills explain what he
4   understood the law to be and that it was legal and
5   there was no crime against card counting?
6       MR. CREECH: Objection.
7       MS. BEALL: Objection.
8   A.  Once I went into the hallway, then, yes, I
9   heard Mr. Mills' version.
10  Q.  At that point -- at some point you said
11  "we're not accusing you of doing anything wrong."
12  Do you recall that?
13  A.  Yes.
14  Q.  Okay. And you weren't, right?
15      MR. CREECH: Objection.
16  Q.  You weren't accusing him of doing anything
17  wrong?
18      MR. CREECH: Objection.
19  A.  Correct.
20  Q.  And were you ever accusing him of doing
21  anything wrong?

Page 28

1   A.  No.
2   Q.  Okay. You know you're suing him?
3   A.  Correct.
4   Q.  When you first found out you were suing
5   him, had you instructed anybody to commence a
6   lawsuit on your behalf?
7       MR. CREECH: Objection. Instruct him not
8   to answer if it includes any conversations with
9   counsel.
10      MR. NERSESIAN: If counsel --
11      MR. CREECH: I made my objection. You can
12  go ahead and do whatever you want to. Would
13  you allow him to step out if you want to
14  make -- if you want to discuss it. I don't
15  want to engage in a back and forth, please.
16      MR. NERSESIAN: I understand.
17  Q.  So your understanding in going into that
18  hallway was to get his I.D. so we can get him out of
19  here?
20  A.  Yes.
21  Q.  And that's what you did too, right?

Page 29

1   A.  Yes.
2   Q.  And in doing that, you told him he
3   violated some ordinance. He violated ordinances,
4   right?
5       MR. CREECH: Objection.
6   Q.  Or he was told he violated ordinances by
7   an Anne Arundel police officer, correct?
8       MR. CREECH: Objection. Go ahead.
9   A.  Yes, I believe that's what he was told.
10  Q.  He was also told that he could not leave
11  until he gave his I.D., correct?
12      MR. CREECH: Objection. Go ahead.
13  A.  Correct.
14  Q.  Okay. And that was also by an Anne
15  Arundel police officer?
16      MR. CREECH: Objection. Go ahead.
17  A.  Correct.
18  Q.  And he was also told that if he didn't
19  give up his I.D., and this was by two different Anne
20  Arundel police officers, he was going to be taken in
21  and they were going to fingerprint him and find out

Page 30

1  who he was anyway, wasn't he?
2       MR. CREECH: Objection.
3    A.  I believe one was -- we wanted to know he
4  was told he was going to be taken in. I believe I
5  stated that we needed his I.D. or else we would have
6  to get it through fingerprints.
7    Q.  Which means you're taking him into the
8  police department, right?
9       MR. CREECH: Objection.
10   A.  Usually, yes.
11   Q.  That's how that's done, right. Correct.
12  That's the normal way that happens?
13      MR. CREECH: Objection as to what's the
14   normal way. Go ahead.
15   A.  Most of the time, yes.
16   Q.  Okay. Sorry, lost my train of thought.
17  Did you ever run Watson warrants on Mr. Mills?
18   A.  I don't believe I did.
19   Q.  Do you know if Bilter did?
20   A.  I don't believe he did.
21   Q.  Did anybody ever run Mr. Mills through

Page 31

1  NCIC?
2    A.  I don't know the answer to that.
3    Q.  You know what NCIC is?
4    A.  I do.
5    Q.  Okay. Who -- if you don't know -- all
6  right. Did you or Mr. Bilter do anything to cause
7  Mr. Mills to be run through NCIC?
8       MR. CREECH: Objection. Go ahead.
9    A.  I don't know what access the casino staff
10  has, but as far as the police department, I don't
11  believe that myself or Corporal Bilter did anything
12  in NCIC with Mr. Mills information.
13   Q.  Do you recognize that in custody police
14  citizen encounters are ordinarily stressful and even
15  scary to a citizen?
16      MR. CREECH: Objection. Go ahead.
17      MS. BEALL: Objection.
18   A.  I guess it depends on the citizen, but I
19  can see that, yes.
20   Q.  Now, you're saying that you were working
21  for Maryland Live Casino. Did you ever let

Page 32

1  Mr. Mills know that?
2    A.  I don't believe so.
3    Q.  But you did very verbally and very firmly
4  let him know that you were an Anne Arundel County
5  police officer, didn't you?
6       MR. CREECH: Objection. Go ahead.
7    A.  I don't know if we did verbally. I can't
8  recall that. But, yes, we were in uniform.
9    Q.  You also did it verbally too, didn't you?
10      MR. CREECH: Objection.
11   A.  Again, I don't recall that. But it could
12  have happened.
13   Q.  We're going to return to the You Tube
14  video for the second. And again this is Cam 565.
15  I'm going to start it at 2:25:24. I'll start at
16  12:00 but we'll get to the part that I'm talking
17  about. I'm sorry, Patricia.
18      (Played video.)
19      MR. NERSESIAN: No, I had the wrong spot.
20   I'm going to start it at 2:24:39.
21      (Played video.)

Page 33

1       MR. NERSESIAN: I'm starting at 2:24:30.
2       (Played video.)
3       MR. NERSESIAN: I think I had it
4    backwards.
5    Q.  Did you hear Mr. Bilter say "I'm a
6  Maryland police officer."
7    A.  I did.
8    Q.  Okay. Do you recall that at the time too?
9    A.  I do now after watching the video.
10   Q.  Okay. So there was not only the uniform
11  that showed what you were, or supposedly were, but
12  apparently weren't, but also a verbal identification
13  to Mr. Mills as a Maryland police officer?
14      MR. CREECH: Objection. Is that a
15   question?
16   Q.  Yeah. That happened, right?
17   A.  Correct.
18   Q.  Okay. Did you see anything unseemly at
19  all in taking the power of the state and putting it
20  behind a private company where they can enlist
21  people who tell other people that they are Maryland

Page 34

1  police officers and they are there with the
2  authority of Maryland police officers and you better
3  do what this company tells you to do?
4      MR. CREECH: Objection.
5      MS. BEALL: Objection.
6   A.  I'm sorry, the question again.
7   Q.  Maryland Live is a private company, right?
8   A.  Correct.
9   Q.  You're working for them, right?
10  A.  Yes.
11  Q.  You're a police officer, right?
12  A.  Yes.
13  Q.  You have a guy who gives you directions
14 and assignments, that being Coulter or whoever the
15 head of security is, who is working for that private
16 company, right?
17  A.  Correct.
18  Q.  You're wearing the uniform of the Anne
19 Arundel police department, which is a public
20 organization in place for public safety, right?
21  A.  Correct.

Page 35

1   Q.  Okay. And you are using that appearance
2  and that authority to forward the goals of a private
3  corporation against other citizens. Do you find
4  that unseemly?
5      MR. CREECH: Objection.
6      MS. BEALL: Objection.
7   A.  As long as it doesn't go against our
8  departmental rules and regulations, no.
9   Q.  Okay. Can I hire you to be my security?
10     MR. CREECH: Objection.
11     MS. BEALL: Objection.
12  Q.  Can I hire you to be my body guard?
13     MR. CREECH: Objection. That's total
14  speculation. You don't have to answer that.
15     MR. NERSESIAN: Are you telling him not to
16  answer?
17     MR. CREECH: Yes, I am.
18     MR. NERSESIAN: What?
19     MR. CREECH: Yes. It's an improper form.
20  It's total speculation. You're not giving him
21  any facts. It's just --

Page 36

1   Q.  What are the limits on who can hire
2  secondary -- who can hire you as secondary
3  employment?
4   A.  I don't know what the limitations are.
5  There's rules and regulations set up and it has to
6  be approved through the department when you apply to
7  work at a secondary employment position.
8   Q.  So the big -- the big juggernaut casino
9  with all its corporate juice can apparently get that
10 approval, but you don't know if I can or not?
11     MR. CREECH: Objection.
12     MS. BEALL: Objection.
13     MR. CREECH: Form. A number of other
14  things. Go ahead.
15  A.  I don't know.
16  Q.  But we know that Maryland Live can?
17     MR. CREECH: Objection.
18     MS. BEALL: Objection.
19  Q.  Get the approval, right?
20     MR. CREECH: Objection.
21  A.  They do have the approval.

Page 37

1   Q.  Yeah. Do you know what a kickback is?
2   A.  Somewhat.
3   Q.  Do you know if Maryland Live paid anybody
4  a kickback to have police officers in uniform work
5  on their site?
6      MR. CREECH: Objection.
7      MS. BEALL: Objection.
8   A.  I have no idea.
9   Q.  Okay. Do you know who Mr. Isella is?
10  A.  Yes, I do now.
11  Q.  No, back then?
12  A.  I didn't know him by name, no.
13  Q.  Did you know who he was back then. You
14 would have recognized him. I'm not saying name.
15 But at the time of the Mills occurrence, what did
16 you recognize Mr. Isella as?
17  A.  I knew that he worked at the casino in
18 some form or fashion.
19  Q.  And you don't know who told Bilter,
20 Mr. Bilter, that the -- that this was a violation of
21 some ordinance?