# Michael A. Hodge, CPP, J.D.

145 West Lake Pass ♦ Newnan, GA. 30263
Telephone: (240) 381-5197 ♦ Email: michaelahodge@gmail.com
www.Hodgesecurity.com
**Atlanta Georgia Office: (770) 683-2057**

## Education

**Juris Doctorate**
University of Baltimore School of Law
Baltimore, MD     1997

**B.A. Administration of Justice**
University of the District of Columbia
Washington, DC –     1993

## Professional Education

**Online Teaching Certification**
Penn State University, February 2016

**FEMA COURSES**
Incident Command System 100 and 200, May 2012

**Facility Security Management Course**
Department of Defense
Irvine, CA     2003

**U.S. Secret Service Counter Sniper Training School**
U.S. Secret Service
Beltsville, MD     1990

**U.S. Secret Service Specialized Recruit Training**
U.S. Secret Service
Beltsville, MD     1983

**Basic Police Training Course**
Federal Law Enforcement Training Center
Glynco, Ga.     1983

## Certifications

**Certified Training Instructor** (FEMA Center for Domestic Preparedness (2012)



{MD119357.1}

**Certified Protection Professional (CPP)** (ASIS International, since (2005). Hence Board Certified in Security Management. Domain areas mastered: Security Principles and practices, Business principles and practices, Investigations, Personnel Security, Physical Security, Information Security, Crisis Management, and Legal Aspects.

**Certified Facility Security Officer (FSO)** (Department of Defense, since (2003)

**Certified Law Enforcement Trainer (CLET)** (American Society of Law Enforcement Trainers (2002)

## AWARDS

**Certificate of Appreciation from U.S. Secret Service (2016) for assistance during the Nuclear Security Summit**

**Distinguished Letter from President George W. Bush for Sept. 11, 2001**

## Professional Experience

**Michael A. Hodge & Associates, LLC**                               1997-Present
Provides Security Management Consulting to private Industry,
Government and non-government businesses as well as Forensic Expert
Services and Police Procedures Expertise and Training.

- **Professional Experience**

    o **Adjunct Professor**, University of the District of Columbia, Graduate Homeland Security Program, 2014- (2016)

    o **Adjunct Professor**, Penn State University, teaching Security Administration 2012 - (Present)

    o **Chairman, Workplace Violence Committee, American Gas Association** (Present)
    o Editor, National Legal Preparedness Reporter, DHS/Institute for Public Safety and Justice (2016)

    o **Director, Corporate Security, Washington Gas** 2006 - (Retired 2016)
    In charge of entire security program for Fortune Company. Duties include physical security, guard force management, employee training, computer security, executive

{MD119357.1}

protection, investigations and special event to include supporting U.S. Department of Homeland Security.

In 2011 formulated all security design and programs for ground-up construction of 70 million dollar campus with surface and garage parking.

- Exam developer, Certified Protection Professional and Physical Security Professional, ASIS International, 2007, Orlando, Florida.

- Instructor, Certified Protection Professional (CPP) Review Course (Legal Concepts), ASIS International, 2006.

- Exam developer, Professional Certified Investigator (PCI), ASIS International, 2006, San Diego, Ca.

- **Security Consultant to Jumby Bay Resort, Antigua 2009.**

  Provided Security planning and implementation for Hotel Security, Security Guard Training, and Bars and nightclub.

- **Security Consultant to Mill Reef Club 2008-2005.**

  Provided Security planning and implementation for Hotel Security, Security Guard Training, and Bars and nightclub.

- Instructor, Harvest Life Changers Church Security Academy, Woodbridge, VA. 2005.

- **Architect of the Certified Cargo Security Professional (CCSP) credential and exam, American Trucking Associations**, 2005.

- **Director of Security, American Trucking Associations**, 2004 – 2006

- **Director of Security, Center for Advanced Study of Language, University of Maryland**, College Park Maryland, 2003.

  Directed the security program for a start-up classified research center.

- **Officer/Technician, U.S. Secret Service, 20 Years RETIRED.** 1983-2003.
  Responsible for protection of the President of the United States and family, Vice President of the United States and family, Dignitaries and the general public.  Duties included protection of White House and other Executive designated offices and locations.  Expert in conducting security surveys, assessments, and security planning for many different environments.

- **Security Guard/Military Police, U.S. Marine Corps, 1979-1982.**

{MD119357.1}

  Non-Commissioned Officer providing security to the U.S. Pentagon and Headquarters Marine Corps in Arlington, Va.

- Author (Legal & Legislative Section, Protection of Assets Bulletin/Manual, POA Publishing.

- Workplace Violence Consultant, Occupational Safety & Health Net, 1997-1998.

- Fellow, Institute for Public Safety and Justice, Washington, D.C.; 1997

- Adjunct Professor, University of Maryland, University College, Security Management, 2003

- Adjunct Professor, Bowie State University, Criminal law/Procedures, 2002.

- Adjunct Professor, University of the District of Columbia, Security Management, Forensic Science, Criminal law and procedures, 1997-2002.

- Member, Academic/Practitioner Symposium, ASIS International, 1999.

## Professional Associations

- Forensic Expert Witness Association, member 2009-2010

- National Center for Crime Victims, member 2008

- Chairman, Crime and Loss Prevention Council, ASIS International, 2007

- Chairman, ASIS National School Violence Task Force, 2006 - 2007

- Vice Chairman, Crime and Loss Prevention Council, ASIS International, 2005-2007

- **ASIS International, 1998**

## Publications

- Expert Commentary, Special Events Magazine (Paris Theater Terrorist Attack), November 2015.

- Attorney's Guide to Crime Scene Investigations, Michael A. Hodge, 2015.

- Crime Scene Investigations for TV and Film Professionals, Michael A. Hodge, 2015.

- Managers Guide to Workplace Violence, Michael A. Hodge and Associates, 2014.

- Domestic Violence Plan, Michael A. Hodge and Associates, 2013.

- Book, Safety Plan for College, MahaPublications, LLC 2009.

- Book, Security for Houses of Worship, the Complete Guide, Michael A. Hodge & Associates, LLC, 2006.

- Best Practices for Security for Houses of Worship, ASIS International, 2006.

- Parking Premises Security, Parking Magazine, May 2005.

- Fundamentals of Premise Security, National Parking Association, May 2005

- Special Event Security: Lessons learned from 20 Years in the U.S. Secret Service, Homeland Defense Journal, May 2005.

**POA Bulletin, POA Publishing, 1999-2000**

Trade Secret Policies
ADA - Employers Duty Eliminated When no Jobs are Available
Security Camera Aids Discrimination Suit
Boss Held Personally Liable for Harassment
Workplace Violence Prevention: Emergency Planning (OSH Net.)
Workplace Violence Prevention: Employment Screening (OSH Net.)
Inadequate Security for Parking Lot Abduction
Wackenhut under Fire for Alleged Poor Hiring
Employee Handbook may Constitute a Contract
New Airport Security Legislation
Grooming Policy At Issue
RICO Expand its Reach for Abortion Clinic Security
Travel Safety
Controversial Drug Scanner
Liability Concerns of Workplace Violence
Banking Security
New Mandates for Campus Security
Franchises Liability: "Is a matter of control"
Diplomatic Immunity
OSHA and Ergonomics
Employment Screening
Employee Background Investigations - Complying with the Fair Credit Reporting Act
Video Surveillance in the Workplace: Employers responsibility vs. Employee rights.

{MD119357.1}

Company Policies not always a valid defense in Discrimination Cases
Liability for Cell Phone Usage Goes to Court
Burden of Proof on Employer in Unfair Labor Practice Proceeding
No Medical Necessity Exception to Controlled Substance Act
"Zero Tolerance" debate for School Violence
Disclosure of Lawfully obtained information protected by First Amendment
Liability for Religious Biased evaluation
Wal-Mart Sued for Domestic Violence
Locked doors incur OSHA violation
Military Leave and Reinstatement Rights
Pro-Active Programs May prevent OSHA Inspections
Inadequate Apartment Complex Security
Union Workers Prohibited from Driveway Distribution
Final HIPPA Security Rule in August
U.S. Supreme Court allows Drug Tests for Some Students

## Presentations and Lectures

Workplace Violence & Active Shooter Seminar, Noble Offerings, LLC, March 2016.

What Managers Should Know about Premises Security Liability, ASIS International, DC Chapter, March 2016.

Workplace Violence Best Practices for Pipeline Industry, American Gas Association, Austin, TX September 2009.

Fundamentals of conducting Workplace Investigations, Washington Gas Light, September 2009.

Workplace Violence, American Gas Association, March 2009.

Inside the premises security experts view: Evaluation and workup, National Crime Victims Bar Association, October 2008.

Church Security, Faquier County Coalition of Ministers, March 2008.

Protection of Utilities, Prince George's County Maryland Department of Homeland Security, October, 2007.

Planning led to flawless security for Pope's Funeral (Expert Commentary); Special Events Magazine, April 13, 2005.

Atlanta Courthouse Shooting, (Expert Interview), ABCNEWS.com, March 11, 2005

Bottom line of Cargo Theft, National Motor Freight Traffic Association, Alexandria, Virginia, November 8, 2004.

{MD119357.1}

Cargo Theft Investigations, Western States Association of Burglary and Theft Investigators, Reno Nevada October 22, 2004.

Workplace Violence Prevention, National Association of Blacks in Criminal Justice, Jacksonville, Florida, 2002.

Emergency Management, University of the District of Columbia, Washington DC, 2002.

Workplace Violence, Goodwill Industries, Inc. Human Resources Conference, Las Vegas, Nevada, 2001.

Premises Security Liability, International Association of Black Security Executives annual conference, Washington, D.C. 2001.

## Continuing Education

**Negligent Security Seminar: People+Premises+Data. 7th Annual Leighton law Seminar Series. March 31, 2015.**

**ASIS International 60th Annual Seminar and Exhibits, Atlanta GA. Sept. 29-Oct. 2, 2014.**

**CCTV: What you See is What you Get. InfraGard (Instructor Paul Smith) Feb. 7, 2014. Capitol Heights MD.**

"This workshop is designed to enhance the operational use of Closed Circuit Television (CCTV) operators and Managers by providing instruction on the key elements of situational awareness and associated proactive CCTV techniques."

**Improvised Explosive Device (IED) Counterterrorism Workshop, DHS, January 17, 2014.**

**ASIS International 61th Annual Seminar and Exhibits, Irvine, Calif. 2015**

Michael A. Hodge and Associates, LLC
145 West Lake Pass
Newnan, GA. 30263

December 26, 2016

To:   David M. Trojanowski
      Marks, O'Neill, O'Brien, Doherty & Kelly, P.C.
      Suite 305
      600 Baltimore Avenue
      Towson, MD 21204

Re:   Mills v. PPE Casino Resorts

**Preface**

This expert report is written in accordance with methodology used by Forensic Consultants rendering opinions within the private security industry. Based on my expertise in the security industry and qualifications to testify (detailed further below and in my CV attached); you have asked me to review the evidence in the case to date and to render a written opinion to address these questions:

1) Did Maryland Casino Live Security operate within the standards of care with respect to Mr. Mills?

2) Did Maryland Casino Live conspire to Anne Arundel Police to violate Mr. Mills Civil Rights?

**Facts and Circumstances**

On February 21, 2014; Plaintiff Lawrence Mills was an invitee to the Maryland Live Casino in Anne Arundel, Maryland. At approximately 2356 hours, surveillance office was notified by a Floor Supervisor (Jason Yeager) of Lawrence Mills being a known "advantage" player. Such activity is not permitted on the premises.


EXHIBIT 2

Hence, Mills status as an "Advantage" player was confirmed in the Casino's system. Thereafter, a Manager and Supervisor approached Mills to escort him to a hallway to receive his identification and receive an "Eviction" notice from the premises.

Surveillance camera video shows Mr. Mills reluctance to follow security personnel to a hallway outside the public's presence. The camera footage also shows security personnel using minimal escort procedures to guide Mr. Mills to the hallway.

It's the escort of Mr. Mills while on the premises that appears to be the subject of the Plaintiff's complaint.

**Materials Relied upon**

The following is a list of materials relied upon in reaching my opinions.

1. YouTube Video (Re: Escort of Mills from Premises)
2. Plaintiff's Complaint
3. Plaintiff's Responses To Def. Interrogatories
4. Casino Incident Full Report
5. Casino Eviction Notice for Lawrence Mills
6. Maryland Live Casino Standard Operating Procedures
7. Maryland Live Casino Responsible Gaming Plan
8. Phone recording Transcript (Mills Mobile Phone)
9. ASIS International Physical Security Guidelines
10. ASIS Protection of Assets Manual on Physical Security
11. The FBI Bureau of Investigation Bulletin: Policing the Gaming Environment – Kenneth Peak, Phd

<u>Duty of Care</u>

On February 21, 2014; Plaintiff Lawrence Mills was an invitee to the Maryland Live Casino in Anne Arundel, Maryland. As an invitee within the standards of care in the security industry; Mr. Mills was owed a duty of reasonable from foreseeable risks of harms and as an invitee; that duty is subject to revocation by those who control the premises.

Because the Casino had a system that recorded violators of its policies, staff of Maryland Live was able to determine that Mr. Mills could be evicted from the premises.

Upon an eviction by security staff; to comply with the standards of care within the security industry, it must be done with reasonable care under the circumstances.

In this matter, it's clear from review of video footage that the only contact upon Mr. Mills was Security tucking their hand under Mr. Mill's arms and guiding him to the hallway

which minimizes public exposure.

Hence, this escort was reasonable and within the standards of care for the security industry involving the immediate environment.

Further, at all times, Staff and personnel of Maryland Casino Live acted in accordance with its internal policies and the law, and did not breach its duty of care to Mr. Mills as all such activities comports with security industry standards, guidelines, customs and practices.

### No Assault by Maryland Casino Live Staff upon Mr. Mills

There are no facts in this case to support that Security in this matter inflicted offensive contact upon Mr. Mills at any time.

In the security industry, the purpose of placing one's hand under the armpit as done to Mr. Mills, is to guide the person to a particular area. The video footage confirms this activity. Opposed to the allegations by the Plaintiff, the video footage does not indicate Mr. Mills arm being violently and/or physically thrust behind his back.

In the security industry, the arm-pit guide is used as it assists someone like Mr. Mill where to go; especially when he is resisting as he admitted too in this matter. Also, from a public standpoint, other patrons do not know if such a person is being assisted because of medical purposes or inebriation which is common for this environment.

Accordingly, the slight contact made to Mr. Mills by security staff was reasonable under the circumstances and was not done in a manner to offend Mr. Mill's sense of dignity.

### No False arrest or False Imprisonment by Maryland Casino Live Staff upon Mr. Mills

Foremost, there are no facts in this matter to support that Maryland Casino Live Staff executed an arrest or false imprisonment upon Mr. Mills.

At all times, security staff acted reasonably by trying to evict Mr. Mills from the premises expeditiously. The video footage in this matter supports this. It was Mr. Mills who refuse to leave the floor and the premises.

Staff acted in accordance with their policies and procedures to obtain information from Mr. Mills to complete the eviction notice. There are no facts to support that security detained Mr. Mills and bounded him to a particular area for an unreasonable amount of time; nor did inform him at any time her wasn't free to leave.

Accordingly, the escort from the floor to the hallway was done in a very reasonable time period and at no time did staff use handcuffs, a bounded areas, or physical restraints to keep Mr. Mills on the premises. Again, the staff simply attempted to get Mr. Mills Identification for the sole purpose of the eviction and nothing else.

Moreover, there are facts to support that Mr. Mills remained on the premises and in the presence of security to build a civil case against the Casino.

As part of my review in this matter, I reviewed audio transcribed from Mr. Mills telephone as Mr. Mills covertly taped Security's attempt to obtain Mr. Mills identification. Also, from the initial moment security requested Mr. Mills to follow them to a non-public area, Mr. Mills made several statements to making a case against the casino independent of any real claims inflicted by Casino staff.

### No False Light by Maryland Casino Live Staff upon Mr. Mills

As mentioned above, at all times Security staff conduct was reasonable and within the standards of care in making sure that Mr. Mills eviction was not opened to public exposure within the Casino.

The facts are clear as the video footage security approached Mr. Mills and attempted to expeditiously escort him to an area outside the public's view for further action of obtaining information for the eviction form. Security did not yell, shout, or engage in a physical confrontation to achieve its purposes under their policies.

Further, the procedure to move a patron to a hallway or backroom is a reasonable security measure to prevent any public scrutiny of a patron.

### No Negligent Hiring and Retention of Security Staff

The claim that any Maryland Casino Live Security Staff was negligently hired or retained is without merit.

Foremost, the Casino has a very detailed policy and procedures manual. There standards of operating procedures is reasonable according to the standards in the security industry. In addition to other measures, the manual is very detailed especially how to evict a patron upon its premises.

Moreover, there are no facts to support that the security staff activities on February 21, 2014 falls below any hiring or training standard within the security industry.

### No Violation of Mr. Mills Civil Rights or Conspiracy with the Police

Mr. Mills Complaint alleges a conspiracy with the Police and Security Staff to violate the civil rights with Mr. Mills.

The facts are clear the Security Staff of Maryland Casino Live in no way train, agree upon, or work together in their prospective employment role. Also, there are no facts to support that Security staff serves as an arm of the Maryland Government or Anne Arundel Police.

Accordingly, Maryland Casino Live Standard Operating Procedures is clear as it identifies is requirement to have police officers respond and address violations of Maryland Law.

Hence, Maryland Casino Live request from assistance from the Anne Arundel police is a reasonable security measure recognized and implemented by the private security industry and does not assume any agreement by Security Staff and Police to violate the rights of any citizen using the Casino.

## Opinions

Based on my review of the materials in this case and consideration of best practices in the industry, I have formed opinions. I reserve the right to alter such opinions should additional information become available prior to the time of trial. I hold these opinions to a reasonable degree of certainty within the field of private security:

It is my opinion that Defendants Maryland Casino Live and its employees:

1) Did not breach any standards of care owed to the Plaintiff.

2) At all times used reasonable to evict Mr. Mills from its premises.

3) At all times respected the civil rights of Mr. Mills.

4) Did not conspire with Anne Arundel Police to violate any civil rights of Mr. Mills.

The basis and reasons for my opinion(s) are premised upon my education, training, experience, and knowledge of the security industry customs, practices, standards, analysis and study in the field, through consulting professional literature, through seminars, and the facts of the case presented and materials reviewed. Specifically, my experienced includes Board certification in Security Management, retired from the U.S. Secret Service after 20 years of service, Professor of Security Management, published author in the Security Industry, Former Chairman of the ASIS Crime and Loss Prevention Council, Certified Facility Security Officer,

Certified law Enforcement Trainer, and a security professional who has conducted over 100 surveys of premises and established security plans for various premises and environments.

I proffer these opinions based upon the experience, education, and training above, and reserve the right to modify such opinions if additional information is provided.

Sincerely,

*[signature]*

Michael A. Hodge, CPP, JD





EXHIBIT
3

```
1            IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF MARYLAND

3    JUSTIN MILLS,

4           Plaintiff                  Case No.

5       vs.                            RDB 15-495

6    ANNE ARUNDEL COUNTY,

7    MARYLAND, ET AL,

8           Defendants
                                       /
9    _____

10          Pursuant to Notice, the deposition of

11   DOUGLAS BILTER was taken on Friday, February

12   24, 2017, commencing at 9:58 a.m., at the

13   offices of Anne Arundel County Office of Law,

14   2660 Riva Road, 4th Floor, Annapolis, Maryland

15   21401 before David C. Corbin, a Registered

16   Professional Reporter and Notary Public.

17

18

19          Corbin Reporting and Video

20          Serving MD, DC, No.VA & DE

21          REPORTED BY:  David Corbin, RPR
```



EXHIBIT 4

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017
Pages 98–101

Page 98

1     MS. BEALL: Objection.
2   A. If somebody said, yeah, I'm getting the
3 police and this guys shows up in a uniform, yeah,
4 it's safe to assume that's a police officer.
5   Q. Thank you. Now, let's return to the
6 identification thing for a moment. In coursework
7 you studied Terry versus Ohio and its effects,
8 right?
9   A. Yes.
10   Q. Let me throw some other names at you.
11 Brown versus Texas?
12     MR. CREECH: Objection.
13   A. It sounds familiar. Wouldn't be able to
14 give you details.
15   Q. If I told you it was a case where a police
16 officer walked up on three African American youths
17 in a garage and didn't really like the way they
18 looked and demanded their I.D. Does that give you a
19 recollection?
20     MR. CREECH: Objection. Go ahead.
21   A. No.

Page 99

1   Q. Do you understand as a police officer that
2 articulable facts mean articulable facts that give
3 reason for you to believe that a crime is occurring?
4     MR. CREECH: Objection. Go ahead.
5   A. Yes.
6   Q. And absent that, do you understand and
7 recognize you can not demand identification of a
8 person?
9     MR. CREECH: Objection.
10     MS. BEALL: Objection.
11     MR. CREECH: Go ahead.
12   A. Your question is can I demand
13 identification?
14   Q. Can you compel a person to produce -- I'll
15 change it. Can you compel a person to produce
16 identification absent reasonable suspicion based on
17 articulable facts of a crime being committed or
18 about to be committed by the person?
19     MR. CREECH: Objection. Go ahead.
20     MS. BEALL: Objection.
21   A. No, they are not required to give you

Page 100

1 their identification.
2   Q. And they can say no, right?
3   A. Correct.
4   Q. Why couldn't Mr. Mills say no?
5     MR. CREECH: Objection.
6   A. He could have said no.
7     MR. NERSESIAN: Off the record a second.
8     (Off the record colloquy.)
9 BY MR. NERSESIAN:
10   Q. Now, having worked -- how many times have
11 you had a shift at Maryland Live. Now?
12   A. Since the incident or just in general how
13 many times I've worked there?
14   Q. All the way.
15   A. I have no idea. A good amount.
16   Q. How long have you been doing it?
17   A. I've been doing since right after the
18 casino opened.
19   Q. Do you do any other extra Anne Arundel
20 County security work?
21   A. Secondary employment jobs?

Page 101

1   Q. Yes.
2   A. Yes, I do.
3   Q. What else?
4   A. I work for Best Buy. I work for Homestead
5 Gardens. I work for --
6   Q. I'm -- I want to ask a question as we walk
7 through there. When you work for Best Buy, are you
8 the only security guy onsite?
9   A. No.
10   Q. Who else?
11   A. Other security officers.
12   Q. That work for Best Buy?
13   A. Best Buy.
14   Q. Best Buy. Then the next one was?
15   A. I don't remember.
16   Q. Gardens?
17   A. Homestead Gardens.
18   Q. Yes. What is that?
19   A. That is we're pretty much sitting in a
20 parking lot protecting people from stealing like
21 mulch and plants and stuff like that when they are

LAWRENCE JUSTIN MILLS vs ANNE ARUNDEL COUNTY, MARYLAND
Transcript of Douglas Bilter taken February 24, 2017
Pages 102–105

Page 102

1  closed.
2  Q. Are all of those people police officers on
3  secondary employment?
4  A. I don't know. I don't know.
5  Q. Now, what do you understand about
6  trespassing and giving trespass warnings?
7       MR. CREECH: Objection. Go ahead.
8  A. What do I understand about trespassing,
9  like giving trespassing warnings?
10 Q. First about trespassing. No. Let's talk
11 about the warnings. What is the warning necessary
12 in order for a person to have to leave?
13      MR. CREECH: Objection.
14      MS. BEALL: Objection.
15 A. I mean you don't have to have a
16 necessarily warning. You mean somebody physically
17 saying like you're banned or you're asking --
18 Q. Right.
19 A. -- what do I know about them?
20 Q. No, here's -- let me see if I can lay it
21 out in an orderly fashion. Is it your understanding

Page 103

1  that companies and premises owners and occupants
2  have the authority to bar anybody from -- or exclude
3  anybody from their property for any or no reason?
4  A. Yes. Generally, yes.
5  Q. All right.
6  A. On a private property scenario, yes.
7  Q. And, again, on that private property
8  scenario, if they have done that and the person who
9  has been excluded violates it, they can be arrested
10 for trespassing?
11 A. Yes. Or criminally charged.
12 Q. Yes. That's the penalty for violating it.
13 And before it can happen, they have to be excluded,
14 right?
15 A. Yes.
16 Q. What is necessary to exclude a person as
17 you understand it?
18      MR. CREECH: Objection.
19 A. I don't know. I have never done it.
20 Normally if it's a property owner, telling them
21 you're not welcome back here, don't come back,

Page 104

1  it's --
2  Q. Isn't that it?
3       MR. CREECH: Objection. He didn't
4  complete his answer.
5  A. What's that. You're talking about --
6  Q. To effectively set up a later trespass,
7  isn't that all of it, you have to have told the
8  person you're not welcome here and don't come back.
9  There is no more, no less?
10      MR. CREECH: Objection.
11      MS. BEALL: Objection.
12 A. Normally. Now you could like mail them
13 something saying don't come back. There are other
14 situations, but generally that's the way we do a
15 trespassing charge.
16 Q. And that's sufficient to vest the right to
17 keep that person off of your property, just tell
18 them to get off and don't come back, right?
19      MR. CREECH: Objection.
20      MS. BEALL: Objection.
21 A. Generally, yes.

Page 105

1  Q. So why all this rigmarole about having to
2  send a letter and needing his I.D. and all that
3  other stuff?
4       MR. CREECH: Objection.
5       MS. BEALL: Objection.
6  A. You're asking me what the point of they do
7  the ban forms for. I don't know.
8  Q. Okay. You don't even know why they do
9  them?
10      MR. CREECH: Objection.
11      MS. BEALL: Objection.
12 Q. Do you know even know why they do them?
13      MR. CREECH: Objection. Go ahead.
14      MS. BEALL: Objection.
15 A. I don't.
16 Q. So from your understanding, once they tell
17 them to get out and don't ever come back, that
18 person has received a valid trespass warning?
19      MR. CREECH: Objection.
20      MS. BEALL: Objection.
21 A. As long as it's a person telling them who